PLEASURE BAY APARTMENTS, A NEW JERSEY PARTNER-
SHIP, PLAINTIFF-APPELLANT, v. CITY OF LONG
BRANCH, GEORGE B. HOFFMAN, COUNCIL PRESIDENT,
CITY OF LONG BRANCH, AND DEPARTMENT OF SANI-
TATION, CITY OF LONG BRANCH, DEFENDANTS-RE-
SPONDENTS.

VISTA GARDENS, INC. AND VISTA ASSOCIATES, INC.,
PLAINTIFFS-RESPONDENTS, v. MAYOR AND COUNCIL
OF THE BOROUGH OF LODI, DEFENDANT-APPELLANT.

Argued September 23, 1974—Decided November 6, 1974.

*Mr. Clive S. Cummis* argued the cause for appellant Pleasure Bay Apartments (*Messrs. Brigiani & Cohen,* attorneys; *Mr. Louis Cohen,* on the brief).

*Mr. Robert L. Mauro* argued the cause for respondents City of Long Branch, et al.

*Mr. John M. DiMaria* argued the cause for appellant Borough of Lodi (*Messrs. Carbonetti & DiMaria,* attorneys).

*Mr. Robert K. Hartmann* argued the cause for respondents Vista Gardens, Inc. et al. (*Messrs. Harlmann & Brooks,* attorneys; *Mr. Ronald M. Fraioli,* on the brief).

The opinion of the Court was delivered by

KOLOVSKY, P. J. A. D., Temporarily Assigned. The garbage collection service afforded at municipal expense to properties in each of the defendant municipalities — by Long Branch using its own equipment and employees and by Lodi by contract with a private scavenger — is limited to collection from the curbside of streets adjacent to the premises to be served. Further, each municipality requires, among other things, that the garbage to be so collected be in receptacles, cans or barrels whose weight, when full, does not exceed 70 or 75 pounds.

Plaintiffs Vista Gardens, Inc. and Vista Associates, Inc. (Vista) own adjacent garden apartment complexes in Lodi containing a total of 174 dwelling units. The garden apartment complex in Long Branch owned by plaintiff Pleasure Bay Apartments (Pleasure Bay) contains 240 family units.

Provision has been made in each complex for the deposit by its tenants of garbage and other refuse into "dumpsters"— large rectangular metal bins or containers, maintained at several locations in the parking areas of the garden apartment complexes. Three dumpsters, whose size is not disclosed by the record, service the Vista complex. Seven dumpsters, six with a capacity of six cubic yards and one with a capacity of eight cubic yards, service the Pleasure Bay complex.

In the past plaintiffs have provided for disposition of the garbage collected in the dumpsters at their own expense; in the case of Vista, $3132 per year, in the case of Pleasure Bay, $11,280 per year. Trucks of private garbage collectors hired by plaintiffs entered the garden apartment complexes and, by means of pneumatic loaders attached to the trucks, raised and emptied the dumpsters into the trucks and carted away the garbage and refuse.

Each of the above actions in lieu of prerogative writs was instituted — *Pleasure Bay* in the Law Division, Monmouth County, *Vista* in the Law Division, Bergen County — to compel the municipal defendant to provide, without cost to plaintiff, for removal of garbage from the dumpsters. Each plaintiff also sought to recover as damages the moneys which it had expended in payments for those services to private contractors from and after the date the municipality had rejected a demand that it furnish such services.

Plaintiffs contended that the action of the municipality in denying them such services, while at the same time furnishing curbside collection services to properties which could effectively avail themselves thereof, was arbitrary and unreasonable and denied plaintiffs the equal protection of the laws.

The decisions reached by the trial courts in the two actions are in conflict. In *Pleasure Bay v. Long Branch,* the court, after a plenary trial, ruled that the municipal action was neither arbitrary nor unreasonable and did not deny plaintiff the equal protection of the laws. The Appellate Division, in an unreported opinion, affirmed "substantially for the reasons" given by the trial judge in his oral opinion. We granted plaintiff's petition for certification. 65 *N. J.* 282 (1974).

In *Vista v. Lodi,* the trial judge, after consideration of the affidavits submitted, his own inspection of the apartment house complex and the argument of counsel, entered a judgment in which he found that there is "no reasonable justification for the refusal of the defendant to go upon the premises of the plaintiff for the purpose of removing garbage stored in central locations in bins"; that such refusal is "arbitrary and discriminatory and violates the constitutional rights of the plaintiffs"; and that:

The requirement of the defendant that the plaintiffs place its garbage at curbside in small containers containing refuse produced by each apartment is an attempt to circumvent the edict of the Court in the Case of *Boulevard Apartments, Inc. v. Mayor and Council of Lodi,* 110 *N. J. Super.* 406, 265 *A.* 2d 838 (App. Div. 1970); and in addition it is determined that such a method of disposing of garbage would create a health hazard; would be unsightly and destroy the aesthetics of the neighborhood; and would attract rodents.[1]

---

[1]The contract for the removal of garbage between the Borough of Lodi and Vito Stamato & Co., Inc—which was in effect during the period here involved — was the same contract referred to in *Boulevard Apts. Inc. v. Mayor & Coun. of Lodi,* 110 *N. J. Super.* 406 (App. Div. 1970), a contract for 5 years from January 1, 1969. The contract by its terms excluded garden type apartments from those furnished curbside garbage collection. *Boulevard Apts. Inc., supra,* held that that exclusion was invalid. It is uncontradicted that since that decision Lodi has offered and has furnished curbside garbage collection to those garden apartments electing to avail themselves of that service.

The judgment dismissed plaintiffs' claim for damages stemming from Lodi's "refusal * * * to collect the plaintiffs' garbage in the past" but then concluded:

The Borough of Lodi is hereby ordered to commence to pick up garbage from the premises of the plaintiffs located within the containers located thereon, on the same schedule that other residential units in the Borough of Lodi are serviced.

The plaintiffs shall provide reasonable liability insurance so as to indemnify either the Borough of Lodi or its scavenger contractor with respect to any acts of negligence that it may commit while upon the premises of the plaintiff. Said policy shall be in the standard form of liability policy and shall not be required to exceed $1,000,000.00.

While Lodi's appeal from the judgment was pending unheard in the Appellate Division, we, on our own motion, certified the appeal for consideration with the *Pleasure Bay* appeal.

We conclude, for the reasons hereinafter expressed, that the judgment of the Appellate Division in *Pleasure Bay* should be affirmed and that the judgment of the Law Division in *Vista* should be reversed.

Although, as hereinafter noted, a municipality has the discretionary power to provide a municipal service for the collection and disposal of garbage, it has long been recognized, without dissent, that "it is the duty, primarily, of a person on whose premises are garbage and refuse material, to see to it, by proper diligence, that no nuisance arises therefrom which endangers the public health * * *. He may [be] required, at his own expense, to make, from time to time, such disposition of obnoxious substances originating on premises occupied by him as [is] necessary in order to guard the public health." *California Reduction Company v. Sanitary Reduction Works,* 199 *U. S.* 306, 321–322, 26 *S. Ct.* 100, 104, 50 *L. Ed.* 204, 211 (1905); see also *People ex rel. Webster v. City of Chicago,* 272 *Ill.* 451, 112 *N. E.* 280, 283 (Sup. Ct. 1916); *Silver v. City of Los Angeles,* 217 Cal. App. 2d 134, 31 *Cal. Rptr.* 545, 549 (Ct. App. 1963).

However, since "the collection and disposal of garbage are so intimately associated with the public health [it is also recognized] that stringent control thereof is indispensable." *Marangi Bros. v. Bd. of Com'rs of Ridgewood,* 33 *N. J. Super.* 294, 300 (App. Div. 1954). To that end, in the exercise of the police power, the State itself or municipalities which have been granted that power may enact or adopt necessary and reasonable statutes, ordinances or other regulations governing the collection, removal and disposal of garbage and other refuse. *Marangi Bros., supra; Township of Dover v. Witt,* 7 *N. J. Super.* 259 (App. Div. 1950); *Atlantic City v. Abbott,* 73 *N. J. L.* 281, 282–283 (Sup. Ct. 1906); 7 *McQuillin, Municipal Corporations,* § 24.242 (3 ed. 1968); Annotation, "Garbage-Regulations," 15 *A. L. R.* 287 (1921), supplemented 72 *A. L. R.* 520 (1931) and 135 *A. L. R.* 1305 (1941).

Historically, and prior to 1970, this State left such regulation primarily to its municipalities and local boards of health under the "ample power," *Township of Dover v. Witt, supra,* granted by *N. J. S. A.* 40:48-2, *N. J. S. A.* 26:3-31; *N. J. S. A.* 40:66-1 *et seq.* and *N. J. S. A.* 40:52-1 (c). Direct state control was limited essentially to: (1) regulations adopted under the former Tenement House Act and the present "Hotel and Multiple Dwelling Law," *N. J. S. A.* 55:13A-1 *et seq.,* requiring among other things that owners provide — "except where an alternative method providing equivalent health and safety methods is utilized such as incineration or compaction" — sufficient receptacles for the deposit of the tenants' garbage and waste, to be "located so as to be accessible to the collecting agency," *N. J. A. C.* 5:10-19.4; and (2) health regulations set out in the State Sanitary Code. Enforcement of the latter regulations was delegated to local boards of health who were also given power to adopt regulations "more restrictive than the provisions of the State Sanitary Code." *N. J. S. A.* 26:1A-9. *Cf. Bd. of Health of Weehawken Tp. v. N. Y. Central R. Co.,* 4 *N. J.* 293, 299 (1950).

In 1970, the Legislature provided for more direct controls by the State itself by enacting two statutes, the "Solid Waste Management Act (1970)," *N. J. S. A.* 13:1E–1 to 15 and the "Solid Waste Utility Control Act of 1970," *N. J. S. A.* 48:13A–1 to 13.

Each of the acts contain substantially identical findings and declarations by the Legislature — we quote from *N. J. S. A.* 48:13A–2

> * * * that the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection, disposal and utilization service; * * *

The cited section of the Utility Control Act continued with a declaration:

> that such service will more likely be achieved if the Public Utility Commission is charged with the duty of setting and enforcing standards and rates for regulating economic aspects of solid waste collection, disposal and utilization service; * * *

The remaining sections of that act provide, among other things, for qualifications and certifications by the Public Utility Commission of persons seeking to engage in the business of solid waste collection or solid waste disposal, *N. J. S. A.* 48:13A–6, authorize the Commission, "when it finds that the public interest requires," to designate franchise areas, *N. J. S. A.* 48:13A–5, and give the Commission power to require an adjustment when it finds charges or rates for such service to be excessive. *N. J. S. A.* 48:13A–7.

In the case of the Solid Waste Management Act, the Legislature declared, *N. J. S. A.* 13:1E–2, that:

> * * * the current solid waste crisis should be resolved not only by the enforcement of more stringent and realistic regulations upon the solid waste industry, but also through the development and formulation of State-wide, regional, county, and intercounty plans for solid waste management and guidelines to implement the plans.

Among the provisions of that Act is the grant of power to the State Department of Environmental Protection "to supervise solid waste collection and disposal facilities or operations." *N. J. S. A.* 13 :1E–4. Broad powers, including the power to adopt "codes, rules and regulations" having "the force and effect of law," are granted to that department, and penalties authorized for the violation thereof. *N. J. S. A.* 13 : 1E–6 and 8. Provision is also made for the creation of, and grant of power to, an "Advisory Council on Solid Waste Management." *N. J. S. A.* 13 :1E–7 and 8.

Further, *N. J. S. A.* 13 :1E–5 provides:

a. Unless exempted by the department, no person * * * [may] engage * * * in the collection or disposal of solid waste in this State without first filing a registration statement and obtaining approval thereof from the department.

b. The registration statement shall be made on forms provided by the department and shall contain such information as may be prescribed by the department.

c. No registration shall be approved by the department when in the opinion of the department such solid waste collection or disposal system or operation will not meet the standards or criteria set forth in regulations as may be promulgated under authority of this act.

In *Ringlieb v. Tp. of Parsippany-Troy Hills,* 59 *N. J.* 348 (1971) we affirmed, on the trial judge's opinion, a judgment invalidating a municipal ordinance regulating and licensing sanitary land fill site operations which in most aspects merely duplicated regulations theretofore adopted by the State, adding thereto however provisions for payment of a substantial license fee to the municipality, requirements for the installation of permanent fencing with lockable gates, signs and all weather access and haul roads and limiting the hours during which the site might be operated. We held the ordinance invalid, ruling that the State had preempted the field of regulation of solid waste disposal.

In apparent reaction to our opinion in *Ringlieb,* the Legislature enacted *L.* 1971, c. 461 as a supplement to the Solid Waste Management Act (1970). The 1971 act, approved and effective February 21, 1972, added three sections to the

1970 act. The third, authorizing the imposition of fees by the Department of Environmental Protection for its services, is irrelevant to the issues before us. The first two now appear as *N. J. S. A.* 13:1E–16 and 17 and provide:

> Nothing in the act to which this act is a supplement shall be deemed or construed in any way to affect the powers of local boards of health in relation to health and environmental protection aspects of solid waste collection or solid waste disposal.
>
> *     *     *
>
> No ordinances or regulations of any governing body of a municipality or county or board of health more stringent than this act or any rules or regulations promulgated pursuant thereto, and relating to health and environmental protection aspects of solid waste collection or solid waste disposal, shall be superseded by this act. Nothing in this act or in any rules or regulations promulgated pursuant thereto shall preclude the rights of the governing body of any municipality or county or board of health to adopt health or environmental protection ordinances or regulations more stringent than this act or any rules or regulations promulgated pursuant thereto.

There is no need for us to resolve in this case what effect, if any, the 1970 acts and the 1971 supplement to the Solid Waste Management Act had on various types of regulation recognized by the reported cases as within the ambit of municipal powers prior to the enactment of the 1970 acts. Included therein were powers: (1) to prescribe the character of the receptacle in which garbage may be placed for collection by a scavenger and the character of vehicles to be used in transporting garbage through the streets. *Atlantic City v. Abbott,* 73 *N. J. L.* 281 (Sup. Ct. 1906); (2) to confine dumping of garbage within the municipality's limits to an officially designated and controlled dumping area, *Township of Dover v. Witt, supra;* (3) to adopt ordinances "to license and regulate scavengers," *N. J. S. A.* 40:52–1 (c), a power which could be exercised however only by the governing body of the municipality, not by its board of health, *Bd. of Health of Tp. of Scotch Plains v. Pinto,* 57 *N. J.* 212 (1970); and (4) to grant to the lowest bidding scavenger, after advertising for bids on the charges to be made to various classifications of users, an exclusive license

to collect garbage within the municipality. *Marangi Bros. v. Bd. of Com'rs. of Ridgewood,* 33 *N. J. Super.* 294 (App. Div. 1954). "[T]he ordinary right of the individual householder to negotiate his own independent contract with a third person for such service or to transport his own garbage to a place of disposal, must defer to the common advantage which arises from the [exclusive licensing] ordinance." *Marangi, supra,* at 304.

■ It suffices for this case that we are satisfied that nothing in the 1970 acts forecloses a municipality, in its quest for control of the problems inherent in garbage collection and disposal, to exercise the discretionary powers granted by *N. J. S. A.* 40:66–1 *et seq.* to provide garbage removal and disposal services.

*N. J. S. A.* 40:66–1 reads in pertinent part:

The governing body may provide * * * for the collection, removal and disposal of ashes, garbage, refuse and waste matter, and may establish and operate a system therefor; purchase and operate the necessary equipment * * * for the collection, removal and disposal of ashes, garbage, refuse and waste matter; make, amend, repeal and enforce all such ordinances, resolutions, rules and regulations as may be deemed necessary and proper for the introduction, operation and mangaement of such system, and for the maintenance and operation of a plant for the cremation, destruction and disposal of garbage, refuse and waste matter, and for the government of employees connected therewith.

Further, under *N. J. S. A.* 40:66–4, "the governing body may, if it deem it more advantageous," contract with any person for such collection, removal and disposal services on compliance with the bidding provisions of the section.
In either case,

The governing body may provide for the doing of said work at the general expense, or if deemed by it more advisable, fix the rate or rates to be charged by the municipality for the collection, removal and disposal of ashes, garbage, refuse and waste matter, provide for the manner of payment of the same, and maintain an action at law to recover any moneys due therefor. *N. J. S. A.* 40:66–5.

The power thus granted is discretionary. *Cf. Cloyes v. Delaware Tp., 23 N. J. 324, 332–333 (1957)*; see also *Anderson v. City of Philadelphia, 348 Pa. 583, 36 A. 2d 442 (Sup. Ct. 1944)*. Neither statutory nor case law imposes a mandatory duty on a municipality to furnish a municipal service for the disposal of garbage or other waste. "No householder has a vested right in the initiation or continuance of a municipal service for disposal of waste. It is the householders' duty to dispose of household waste in a manner not violative of laws and ordinances prohibiting the maintenance of nuisances and safeguarding public health." *Silver v. City of Los Angeles, 217 Cal. App. 2d 134, 139, 31 Cal. Rptr. 545, 549 (D. Ct. App. 1963)*. "The removal by a municipality of garbage, ashes and other refuse is a voluntary service. The duty of removing the same is primarily that of the property owners." *Leroy Franz, Inc. v. City of New Rochelle, 124 N. Y. S. 2d 525, 527 (Sup. Ct. 1953)*.

In neither Long Branch nor in Lodi is the collection and disposal of garbage the "exclusive province" of the municipality, as was the furnishing of water in *Reid Development Corp. v. Parsippany-Troy Hills Tp., 10 N. J. 229, 233 (1952)*. Neither municipality prohibits property owners who cannot or do not avail themselves of the municipality's curbside collection service from contracting with private licensed scavengers for the removal of garbage and refuse from their properties.

No case has ever held that a municipality electing to furnish garbage removal services at municipal expense must provide means and facilities which are all inclusive and will insure collection of all garbage and refuse produced in the municipality. All cases which have dealt with the issue have ruled to the contrary. See *Mayor, etc. of Baltimore v. Hampton Court Co., 138 Md. 271, 113 A. 850 (Ct. App. 1921); Anderson v. City of Philadelphia, supra; Terenzio v. Devlin, 361 Pa. 602, 65 A. 2d 374 (Sup. Ct. 1949); Silver v. City of Los Angeles, supra;* and *Leroy Franz, Inc. v. City of New Rochelle, supra.* (Our citation of those cases is not

to be construed as an indication that we necessarily agree with the court's resolution of the "classification" issues presented by the ordinances and municipal action involved in those cases, all of which differ from the municipal action involved in the cases before us.)

■ All that a property owner is entitled to is that the municipal action — here the determination to limit the municipal service to curbside collection of garbage and refuse — not deny him due process and the equal protection of the laws.

The guaranty of due process as it applies to cases of the type here under consideration requires only that a law shall not be unreasonable, arbitrary or capricious, and that the means selected shall bear a rational relation to the legislative object sought to be obtained. * * * Similarly, the constitutional requirement of equal protection is met by legislation that treats all persons within a class reasonably selected, in a like or similar manner. [*Robson v. Rodriquez*, 26 *N. J.* 517, 522–523 (1958)].

The trial court in *Vista Gardens* first ruled that there was a denial of equal protection because Lodi's resolution, awarding Vito Stamato & Co., Inc. a garbage removal contract for five years from January 1, 1969, by its terms excluded garden type apartments from those furnished curbside garbage collection. That ruling was unjustified in face of the uncontradicted proofs that once that exclusion had been ruled invalid in *Boulevard Apts., Inc. v. Mayor & Coun. of Lodi*, 110 *N. J. Super.* 406 (App. Div. 1970), Lodi has offered and has furnished curbside garbage collection to those garden apartments electing to avail themselves of that service.

Indeed, the trial court's opinion acknowledged that Lodi would furnish curbside garbage collection service to garden apartments. Nevertheless, the court ruled, relying on *Teagen Co. v. Bor. of Bergenfield*, 119 *N. J. Super.* 212 (Law Div. 1972), an earlier trial court decision involving the same issue, that the refusal of Lodi to enter upon plaintiffs' premises to collect garbage from the dumpsters situate thereon

was a denial of equal protection because the physical situation at the apartment house complex made it impracticable for the plaintiffs to avail themselves of curbside garbage collection service.

Emphasized were: (1) that only "a small minority of the 174 apartments in the complex" front on a public street, Arnot Street, "the remainder * * * are situated internally along a V-shaped [private] road, Bel Vista Court," and that "the 'curbside' condition in the offer of services negated the service to all but those few apartments which front on Arnot Street"; (2) that "in some instances, trash and debris would have to be carried 600 to 700 feet to bring it within curbside service on Arnot Street," — "an unreasonable burden"; (3) that if tenants were to be required to place their individual garbage cans along the private road, the number of cans required would present an eyesore and a health hazard. The court's supplemental written opinion concluded:

Under these circumstances the court finds that the dumpster-style service presently in effect is a reasonable system for garbage collection within the complex, and that the Borough's proposal of curbside collection presents an unreasonable and unnecessary burden on the tenants of the complex. Thus the court, in accord with *Teagen Co. v. Bor. of Bergenfield, supra*, orders the Borough of Lodi to implement an internal garbage collection service for Vista Gardens, Inc. and Vista Associates, Inc.

■ The court's emphasis on the supposed burden imposed on tenants in the complex is unjustified. No such burden exists and the tenants do not complain. They have the benefit of regulations imposing the duty on the owner of multiple dwellings to provide adequate garbage storage and disposal facilities. *N. J. A. C.* 5:10–19.4. The only complainants here are the owners of the apartment complexes who seek to avoid the expense involved in hiring private scavengers — this by contending that the classification adopted by limiting garbage collection to curbside collections is arbitrary and capricious.

We are satisfied that that contention lacks merit. In *David v. Vesta Co.*, 45 *N. J.* 301, 314–315 (1965), this court said:

* * * The equal protection clause of the Fourteenth Amendment does not deprive the State of the power to classify in the adoption of police laws, but allows wide discretion, precluding only that done without any reasonable basis and therefore purely arbitrary. The constitutionality of a legislative classification is presumed, and one who assails the classification must carry the burden of showing its arbitrariness. A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal portection clause forbids only invidious discrimination. * * *

Further, as Chief Justice Weintraub said in *N. J. Restaurant Assn. v. Holderman,* 24 *N. J.* 295, 300 (1957):

The burden of demonstrating that a statute contravenes the equal protection clause is extremely formidable, as is attested by the long trail of failure. In addition to the strong presumption of constitutionality with which all organic challenges are approached, one who assails a statute on this ground must contend with principles of unusual elasticity. It is easily stated that the classification (1) must not be palpably arbitrary or capricious, and (2) must have a rational basis in relation to the specific objective of the legislation. But the second proposition is qualified by limitations which compound the difficulties of one who assails the legislative decision. Thus it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification, for the Legislature may recognize degrees of harm and hit the evil where it is most felt. * * * The Legislature may thus limit its action upon a decision to proceed cautiously, step by step, or because of practical exigencies, including administrative convenience and expense, * * * or because of "some substantial consideration of public policy or convenience or the service of the general welfare." * * * Hence it may "stop short of those cases in which the harm to the few concerned is thought less important than the harm to the public that would ensue if the rule laid down were made mathematically exact." * * * Additionally, it is established that the equal protection provision does not foreclose classifications in the exercise of the power to tax designed to promote or aid a business in furtherance of the public welfare, *Carmichael v. Southern Coal & Coke Co.*, [301 U. S. 495, 57 S. Ct. 868, 81 L. Ed. 1245] *supra; Schwartz v. Essex County Board of Taxation,* 129 *N. J. L.* 129 (Sup. Ct. 1942), affirmed 130 *N. J. L.*

177 (E. & A. 1943) ; and in principle the same freedom of legislative decision must attend the exercise of the police power.

Of course, these flexible rules still require that the classification be reasonably rooted in facts, but the burden is upon the assailant to negate the existence of the required facts. * * *

See also *N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 601–602 (1967).

The principles thus stated apply to all legislative actions by the state or municipality — both those imposing burdens and restrictions and those granting privileges or providing for the furnishing of services at the expense of the government. All that is required is that the classification "rests on real and not feigned differences." *Airwick Industries, Inc. v. Carlstadt Sewerage Auth.,* 57 *N. J.* 107, 118 (1970) ; *Geduldig v. Aiello,* 417 *U. S.* 484, 94 *S. Ct.* 2485, 41 *L. Ed.* 2d 256 (1974).

*Geduldig v. Aiello, supra,* involved California's disability insurance system which is funded entirely from mandatory contributions from all employees other than those protected by a state approved private plan. Under the governing statute, as construed by the California courts, no benefits are payable for disability accompanying normal pregnancies and deliveries although benefits are payable for disability resulting from medical complications arising during pregnancy. In reversing the decision of a convened three judge court ordering the State to pay benefits for disability accompanying normal pregnancy and delivery, the Supreme Court said:

We cannot agree that the exclusion of this disability from coverage amounts to invidious discrimination under the Equal Protection Clause. California does not discriminate with respect to the persons or groups who are eligible for disability insurance protection under the program. The classification challenged in this case relates to the asserted under-inclusiveness of the set of risks that the State has selected to insure. Although California has created a program to insure most risks of employment disability, it has not chosen to insure all such risks, and this decision is reflected in the level of annual contribution exacted from participating employees. This Court has held that, consistently with the Equal Protection Clause, a State

"may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. * * * The legislature may select one phase of one field and apply a remedy there, neglecting the others * * *." *Williamson v. Lee Optical Co.,* 348 *U. S.* 483, 489, 75 S. Ct. 461, 465, 99 L. Ed. 563; *Jefferson v. Hackney,* 406 *U. S.* 535, 92 S. Ct. 1724, 32 L. Ed. 2d 285 (1972). Particularly with respect to social welfare programs, so long as the line drawn by the State is rationally supportable, the courts will not interpose their judgment as to the appropriate stopping point. "[T]he Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams,* 397 *U. S.* 471, 486–487, 90 S. Ct. 1153, 1162, 25 L. Ed. 2d 491 (1970).

The District Court suggested that moderate alterations in what it regarded as "variables" of the disability insurance program could be made to accommodate the substantial expense required to include normal pregnancy within the program's protection. The same can be said, however, with respect to the other expensive class of disabilities that are excluded from coverage — short-term disabilities. If the Equal Protection Clause were thought to compel disability payments for normal pregnancy, it is hard to perceive why it would not also compel payments for short-term disabilities suffered by participating employees.

It is evident that a totally comprehensive program would be substantially more costly than the present program and would inevitably require state subsidy, a higher rate of employee contribution, a lower scale of benefits for those suffering insured disabilities, or some combination of these measures. There is nothing in the Constitution, however, that requires the State to subordinate or compromise its legitimate interests solely to create a more comprehensive social insurance program than it already has. [94 *S. Ct.* at 2491].

We hold that the determinations of the defendant municipalities to limit the garbage service furnished by them to curbside collection does not amount to invidious discrimination. Contrary to what the Law Division said in *Teagen Co. v. Bor. of Bergenfield, supra,* we are satisfied that the classification resulting from such limitation is based on real and not feigned differences in the problems inherent in collection of garbage from locations within a landowners' premises as contrasted with collections from the curbside.

The court in *Teagen* found and emphasized that the cost to the municipality were it to collect garbage from dumpsters within the plaintiff's apartment house complex would be no

greater and perhaps even slightly less than the cost involved in removing that garbage from cans placed at the curbside.[2]

The *Teagen* court's limitation of its comparison of costs to the costs of removal of garbage produced at plaintiff's complex was unwarranted. It overlooked that if the municipality were to provide garbage pickups from the sites within the apartment house complex at which garbage was stored in dumpsters, it would find it difficult, if not legally impossible, to refuse to provide on site collection service to other property owners who now are required to carry their own garbage cans to the curbside to be collected. Providing on site collection services throughout the municipality would be substantially more costly, a factor which alone furnishes a reasonable basis for the municipal decision to limit its garbage collection services to collection from the curbside.

Further, on site collection gives rise to other problems stemming from entries into the private property to be serviced and the means used in emptying dumpsters, problems not present in the case of curbside collections. The existence of such problems was implicitly recognized by the trial courts in *Teagen* and in *Vista Gardens,* although they apparently deemed them of no significance, when they conditioned the relief granted on the furnishing by the plaintiff to the municipality of liability insurance coverage — in the case of *Vista,* with limits of one million dollars — with respect to accidents or other mishaps occurring on plaintiff's premises. It is neither arbitrary nor unreasonable for a municipality to seek to avoid those problems by limiting its services to curbside collections.

Finally, it is of no legal significance that plaintiffs, because of the physical characteristics of their apartment complexes,

[2]Conflicting testimony was offered at the trial in *Pleasure Bay* as to whether furnishing dumpster collection service to plaintiff's garden apartment complex — which among other things would require equipment of the city's garbage trucks with hydraulic lifts — would be more costly than the cost of collection if the garbage were placed in cans at the curbside.

find it impracticable to avail themselves of the curbside garbage collection services offered. "An otherwise valid statute or ordinance conferring a privilege, is not rendered invalid merely because it chances that particular persons find it hard or even impossible to comply with precedent conditions upon which enjoyment of the privilege is made to depend." *Gant v. City of Oklahoma City,* 289 *U. S.* 98, 102–103, 53 *S. Ct.* 530, 532, 77 *L. Ed.* 1058, 1062 (1933).

The judgment of the Appellate Division in *Pleasure Bay Apartments v. Long Branch* is affirmed.

The judgment of the Law Division in *Vista Gardens v. Lodi* is reversed and judgment entered for defendant.

*For affirmance* in *Pleasure Bay Apartments v. Long Branch*—Chief Justice HUGHES, Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judge KOLOVSKY—7.

*For reversal*—None.

*For reversal* in *Vista Gardens v. Lodi* — Chief Justice HUGHES, Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judge KOLOVSKY—7.

*For affirmance*—None.