853 A.2d 348

BARKER'S TRAILER COURT, INC., PLAINTIFF, v.
BOROUGH OF LAKEHURST, DEFENDANT.

Superior Court of New Jersey
Law Division Ocean County

Decided April 12, 2004.

434

*Michael A. Jacobus* (*Novins, York & Pentony*), for plaintiff.

*Gregory P. McGuckin* (*Dasti, Murphy, McGuckin, Ulaky, Cherkos & Connors*), for defendant.

SERPENTELLI, A.J.S.C.

In this Action in Lieu of Prerogative Writs, the plaintiff, Barker's Trailer Court, Inc. (hereinafter "plaintiff" or "Barker's"), seeks to compel the Borough of Lakehurst (hereinafter "defendant," "Borough" or "Lakehurst") to provide garbage collection for its mobile home court. Alternatively, the plaintiff seeks reimbursement from the defendant for the cost incurred for private collection. This case presents a novel issue not addressed by any controlling New Jersey authority.

Barker's operates a mobile home park within the Borough. It rents approximately 46 spaces [1] for placement thereon of manufactured homes licensed pursuant to Chapter 10 of the Motor Vehicle Laws. *N.J.S.A.* 39:10–1 to –37. By letter dated May 3, 2002, the plaintiff requested that the Borough commence collection of all solid waste generated in the mobile home park or, alternatively, reimburse the plaintiff for the cost of such services. Lakehurst determined that it was not required either to collect the refuse or to make reimbursement. As a result, this suit followed.

The plaintiff posits three justifications for its claimed entitlement to garbage collection or reimbursement for the cost thereof. First, it asserts that it is a "qualified private community" within the meaning of *N.J.S.A.* 40:67–23.2(e), and thus it is entitled to garbage collection pursuant to *N.J.S.A.* 40:67–23.3(a)(3). Second, Barker's contends that the Borough's recent imposition of a municipal service fee on mobile home owners reinforces the presumption that the plaintiff is entitled to collection of solid waste. Third, the plaintiff argues that the defendant's failure to provide for collection and disposal of waste from mobile home parks is

---

[1] The space is commonly known as a "pad."

violative of the plaintiff's equal protection rights. The court will consider each argument in the order presented.

**A.** Is Barker's a "qualified private community" within the meaning of *N.J.S.A.* 40:67–23.2(e)?

The plaintiff contends that it is a "qualified private community" as defined in *N.J.S.A.* 40:67–23.2(e), which provides:

> "Qualified private community" means a residential condominium, cooperative, fee simple community, or horizontal property regime, the residents of which do not receive any tax abatement or tax exemption related to its construction, comprised of a community trust or other trust device, condominium association, homeowners' association, or council of coowners, wherein the cost of maintaining roads and streets and providing essential services is paid for by a not-for-profit entity consisting exclusively of unit owners within the community. No apartment building or garden apartment complex owned by an individual or entity that receives monthly rental payments from tenants who occupy the premises shall be considered a qualified private community.

Barker's acknowledges that it could not be deemed a condominium or fee simple community within the meaning of the quoted section. However, the plaintiff argues that its mobile home park could be considered a cooperative or a horizontal property regime.

Yet, the plaintiff is met with the express definitions of both terms which do not seem to make room for the plaintiff's use. *N.J.S.A.* 40:67–23.2(b) defines a "cooperative" as:

> [A] housing corporation or association wherein the holder of a share or membership interest in the corporation or association is entitled to possess and occupy, for dwelling purposes, a house, apartment, or other unit of housing owned by the corporation or association, or to purchase a unit of housing constructed or erected by the corporation or association.

As noted at the outset, Barker's owns the land within the park and rents pads therein to mobile home owners. There is no entity whose members hold shares or membership interests that entitle them to possess mobile home units owned by the entity, or to purchase a unit of housing constructed by it.

Equally, the plaintiff does not fit into the definition of a "horizontal property regime." *N.J.S.A.* 46:8A–2(e) defines a horizontal property regime as "the form of ownership of real property which

consists of the building or buildings, common elements and other property described in the master deed creating and establishing the same." On the face of it, the statute could not include the mobile home park. There is no master deed. The pad occupants have no ownership interest in the land; they are essentially nothing more than tenants.

There are two legislative enactments governing condominium ownership in the State. The Horizontal Property Act, *N.J.S.A.* 46:8A–1 to –28, was passed in 1963, and subsequently the Condominium Act, *N.J.S.A.* 46:8B–1 to –38, was adopted in 1969. The latter provided an updated method of ownership and administration for that form of housing but is generically similar to ownership under the Horizontal Property Act.

The plaintiff has already conceded that it does not qualify as a "condominium" as defined in *N.J.S.A.* 46:8B–3(h). Its brief cites the definition of "condominium," noting that it is a form of ownership under a master deed. The same is true of a "horizontal property regime" under *N.J.S.A.* 46:8A–2. In short, there is no similarity between either a cooperative or a horizontal property regime and the plaintiff's mobile home park.

**B.** Does the defendant's recent imposition of a municipal service fee reinforce a presumption that the plaintiff is entitled to the collection and disposal of waste or reimbursement for the cost of those services?

Next, the plaintiff contends that the defendant's promulgation of a municipal service fee provides additional justification for requiring Lakehurst to collect Barker's garbage. The plaintiff concedes that *N.J.S.A.* 54:4–1.6 empowers the Borough to impose an annual municipal service fee on manufactured homes located in a mobile home park. Barker's has provided the court with a copy of Chapter XVIII of the Borough Code that provides a formula to calculate the fee. The amount charged is reviewed on an annual basis and changed by resolution. The Code recites that the fee defrays the cost of services provided or paid for by the municipali-

ty or any other appropriate taxing authority for the park tenants. As part of the calculation, the fee is reduced by taxes which are levied against the mobile home park land and improvements pursuant to Title 54 of the New Jersey statutes.

The plaintiff's trial brief argues that the fee completely offsets the reasonable value of any services provided by the municipality. There are no proofs to that effect. In fact, the defendant asserts that the Borough presently provides police protection, public works, including maintenance of local roads, and other municipal services which inure to the benefit of the tenants. The defendant also contends that the taxes presently paid by Barker's hardly offset the cost involved in providing these services so that the fee is merely in addition to the taxes paid. The facts elicited at trial, which are discussed hereafter, fully support the Borough's claims, and even the plaintiff's witness seemed to acknowledge that the fee did not include the cost of garbage collection.

   C.  Defendant's failure to provide solid waste collection for the plaintiff's mobile home park violates the equal protection clause.

The plaintiff's most substantial claim rests on its assertion that the defendant's refusal to provide garbage collection or reimbursement for the cost thereof, constitutes invidious discrimination in violation of the equal protection clause. Barker's acknowledges that a municipality is not mandated to provide municipal garbage removal. *Pleasure Bay Apts. v. City of Long Branch,* 66 *N.J.* 79, 90, 328 *A.*2d 593, 599 (1974); *N.J.S.A.* 40:66–1. However, the plaintiff argues that once a municipality has decided to provide service to those similarly situated, it must do so for all within the class. That argument is certainly supported by our law. *Boulevard Apts., Inc. v. Mayor & Council of Lodi,* 110 *N.J.Super.* 406, 411, 265 *A.*2d 838, 841 (App.Div.), *certif. denied,* 57 *N.J.* 124, 270 *A.*2d 27 (1970).

New Jersey courts have been guided by well-defined principles in their review of legislative classifications challenged

under both Federal and State equal protection. With regard to a classification that is non-suspect and does not burden a fundamental right, the equal protection clause of the Fourteenth Amendment gives the State broad discretion, provided that a rational basis exists for each classification. *David v. Vesta Co.*, 45 *N.J.* 301, 314, 212 *A.*2d 345, 352 (1965). The New Jersey Constitution does not expressly guarantee equal protection of laws, but the quiddity of the constitutional guarantee is found in Article I, Paragraph 1, which is an endowment of fundamental rights. *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568, 494 *A.*2d 294, 302–03 (1985). New Jersey courts apply a balancing test, which examines the nature of the right affected, the extent of governmental intrusion on the right, and the public need for the restriction. *Id.* at 567, 494 *A.*2d at 302. Though in particular circumstances the New Jersey analysis may provide greater protection than the federal rational basis test, the review is essentially the same. *WHS Realty Co. v. Morristown*, 323 *N.J.Super.* 553, 561–62, 733 *A.*2d 1206, 1210 (App.Div.1999).

■ Municipal ordinances are bestowed the same presumption of constitutionality as all legislation. In order to overcome that presumption, the plaintiff must establish the classification is purely arbitrary. Chief Justice Weintraub noted that the burden is an imposing one which "is attested to by a long trail of failure." *N.J. Restaurant Ass'n v. Holderman*, 24 *N.J.* 295, 300, 131 *A.*2d 773, 776 (1957). The Court in *David v. Vesta Co.*, described the task as follows:

A classification having some reasonable basis is not invalid merely because it is not made with mathematical nicety or because in practice it results in some inequality. And the classification must be upheld if any set of facts can reasonably be conceived to support it. In short, the equal protection clause forbids only invidious discrimination. [45 *N.J.* at 315, 212 *A.*2d at 352.]

■ It is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification. "The Legislature may thus limit its action upon a decision to proceed cautiously, . . . or because of practical exigencies, including administrative convenience and expense, . . . or

because of 'some substantial consideration of public policy or convenience or the service of the general welfare.'" *Pleasure Bay Apts., supra.,* 66 *N.J.* at 93, 328 *A.*2d 593 (quoting *N.J. Restaurant Ass'n, supra,* 24 *N.J.* at 300, 131 *A.*2d at 776). The classification must be reasonably rooted in facts, but the burden is upon the assailant to negate the existence of the required facts. Thus, the one who attacks has the burden of establishing a negative proposition, the inherent difficulty of which is compounded by the principle that the legislation must be upheld if any set of facts can reasonably be conceived of to support the classification. *N.J. Restaurant Ass'n, supra,* 24 *N.J.* at 301, 131 *A.*2d at 776.

These rules apply to all legislative actions by the state or municipality, both those imposing burdens and restrictions and those granting privileges or providing for the furnishing of services at the expense of the government. "All that is required is that the classification rests on real and not feigned differences." *Pleasure Bay Apts., supra,* 66 *N.J.* at 94, 328 *A.*2d at 601 (quoting *Airwick Indus., Inc. v. Carlstadt Sewerage Auth.,* 57 *N.J.* 107, 118, 270 *A.*2d 18, 23 (1970)).

To educe the facts of this matter, the court held a hearing on January 13, 2004. Two witnesses were called. The plaintiff produced Charles J. Placek, who is President of Barker's Trailer Court. He testified that the age-restricted community was developed mostly in the 1980s. It consists of 46 mobile homes and two single-family dwellings. The individual mobile homes are connected to the municipal water and sewer system. Over 90 per cent of them have been there for 15 years or more. The trailer court provides snow removal, maintains sewer and water service on the site, supplies street lighting, collects garbage and does general maintenance. The Borough is responsible for other services such as police, fire, first aid and maintenance of the roads adjacent to the mobile home park, for all of which the Borough has initiated a municipal service fee. The Borough also provides trash collection for the two single-family homes located on the mobile home site which abut a public street. A private hauler collects trash at the

mobile home park by picking up dumpsters which are located within the community.

On cross-examination Placek testified that the Borough does not provide garbage collection for the other mobile home park in the town. He also stated that the cost of garbage collection for the mobile homes is factored into the rent charged to each homeowner. Dumpsters are located several hundred feet off the main entrance but Placek asserted that the private collectors are able to navigate their trucks through the roadways within the park.

Placek conceded that only the mobile home park property and the improvements thereof are assessed for real estate tax purposes. The homes are titled by the Motor Vehicle Commission and are not part of the tax assessment. He stated that a municipal service fee was imposed in 2002 as part of a settlement agreement with the Borough. The other mobile home park also pays the same fee. He acknowledged the Borough's explanation that the fee was not intended to cover the cost of on-site water or sewer and garbage collection for each of the mobile home sites. He conceded that both mobile home parks within the Borough have been treated equally with regard to the services provided.

The defendant's only witness was Norbert B. McLean, Jr., who functioned as the Chief of Police since 1987 and the Borough Administrator since 2002. He asserted that the interior roads within the plaintiff's mobile home facility do not meet municipal standards. McLean said that the defendant has two garbage trucks which would not operate well on the interior roads because of their narrowness, thickness and composition and because vehicles are parked on the internal streets which would impede access.

McLean said that the Borough provides curbside garbage collection for residential homes and apartments except for the residences located on the Lakehurst Naval Air Base, which is tax exempt. He claimed that if the 46 mobile homes were taxed they would be assessed at approximately $125,000 each, generating over $180,000 of tax revenue for the Borough. Cross-examination revealed that the trash emanating from an individual mobile home

is probably no greater than any other single family residence within the Borough. With this testimony both sides rested and the parties filed post trial briefs.

As noted, the plaintiff contends that it is entitled to receive garbage collection services on the same terms and conditions as any other residential dwelling within the Borough and that there is no rational basis to distinguish the mobile homes from any other residence. The plaintiff acknowledges that the Borough could require the garbage containers from each of the mobile homes to be placed at a public street and that the Borough is not obligated to enter its private roads. Alternatively, the plaintiff argues that the Borough could enter upon its premises to pick up the dumpsters which are presently utilized, although the evidence suggests that the Borough trucks are not equipped to handle dumpsters. Finally, as a third alternative, the plaintiff asserts that if the Borough is unwilling to collect the trash, Barker's should be reimbursed so that it does not have to charge its residents for the cost of garbage collection.

The Borough justifies its refusal to provide garbage removal simply based upon the fact that it is collecting real estate taxes only for the land and property improvements at the mobile home park and not for the individual mobile homes. Furthermore, it notes that the municipal fee does not cover solid waste removal. The issue becomes whether the Borough's refusal to provide garbage collection services to mobile home parks on the same basis as other residential dwellings constitutes a denial of equal protection given its right to offset the cost of collection with a municipal service fee. Again, our courts have not addressed this question.

The analysis starts with a review of the Final Report of the Mobile Home Taxation Commission which was established pursuant to *N.J.S.A.* 54:4–12 for the purposes of studying and developing an equitable system of taxation for manufactured homes. The term "manufactured home" was utilized in lieu of the term "mobile home" to refer to both manufactured homes located on individual

lots owned in fee by the homeowner and to those located within mobile home parks on pads owned by the park owner. The Commission's work was spurred by a decision of the Supreme Court in *Koester v. Hunterdon County Bd. of Taxation,* 79 *N.J.* 381, 399 *A.2d* 656 (1979), in which it was held that certain manufactured homes were taxable as real property. The decision made no distinction between manufactured homes located on lots owned in fee simple and those within a mobile home park.

The Commission found that while it was necessary to insure equal taxation between "conventional" single-family dwellings and manufactured homes not situated in mobile home parks, there was adequate reason to treat manufactured homes located in mobile home parks differently for tax purposes. The Report noted that the mobile home park owners provide many services which the municipality typically supplies to other municipal residents including garbage collection, ground water drainage, snow removal, and the construction, maintenance and lighting of streets and common areas. Therefore, homeowners in the park utilize a lower level of tax revenues than comparable homeowners otherwise situated. Furthermore, mobile home park owners pay real estate taxes on the land and improvements within the parks and pass them through to the mobile home owners as part of the rental fee.

The Commission recognized that the municipalities typically imposed a fee on homes located within a mobile home park for services provided to the owners which were not defrayed by taxes levied against the park real estate and improvements. The fee system was utilized to insure that the homeowners would pay only for services for which they were not already paying by virtue of the property tax pass-through.

As a result of these findings, the Commission recommended that manufactured homes, except when located in a mobile home park, should be taxed as real property in the same manner as other conventional residential housing. On the other hand, the Commission concluded that the manufactured homes in mobile home parks should not be taxed as real property but rather should be subject-

ed to a municipal service fee in place of taxation. That fee would be related to services actually rendered to homeowners in the park.

The Commission rendered its report in June 1983. On June 30, 1983, Assembly Bill 3600 was introduced. The statement accompanying the bill noted that it was intended to address many difficult questions raised by the *Koester* decision. It stated that the bill recognized that manufactured homes in mobile home parks receive fewer public services than manufactured homes and other single family dwellings situated on private lots. It also found that there are a variety of factors which distinguish manufactured homes installed in mobile home parks from other manufactured homes and single-family dwellings. The statement concludes that, in light of those considerations, the bill provides for an equitable system of taxation and fees, under which homeowners in various circumstances all pay their fair share for public services, and none are required to pay more than their fair share simply because of these circumstances. As previously noted, the bill was ultimately adopted as *N.J.S.A.* 54:4–1.2 to –1.6.

The Act, known as the "Manufactured Home Taxation Act," incorporates many of the Commission's findings and determinations. *N.J.S.A.* 54:4–1.3. In particular, it authorizes the imposition of a municipal fee to offset services the town provides to homeowners within a mobile home park which are not defrayed by the taxes emanating from the levy against the land and improvements of the mobile home park. *N.J.S.A.* 54:4–1.6

As mentioned earlier, the plaintiff acknowledges that a municipality is not mandated to provide municipal garbage removal. However, it argues that once a municipality has decided to provide services to those similarly situated, it must provide the same services to all within that class. Apparently, the Borough does not quarrel with that proposition, and it is, as previously indicated, supported by our case law. *Boulevard Apts., Inc. v. Mayor and Council of Lodi,* 110 *N.J.Super.* 406, 411, 265 *A.2d* 838, 841 (App.Div.), *certif. denied,* 57 *N.J.* 124, 270 *A.2d* 27 (1970). Howev-

er, the defendants argue that different treatment should be given to the mobile home park because it produces less tax revenue to the municipality.

In *WHS Realty Co. supra,* 323 *N.J.Super.* at 572, 733 *A.*2d at 1216, the Court held that "the methodology of taxing apartment complexes and condominium units is not a rational basis for upholding the ordinance," which excluded multi-family dwellings of four or more units from municipal garbage removal. A garden apartment owner challenged the ordinance because it permitted waste removal for condominiums where one entity owned no more that 50% of the units. *Id.* at 560, 733 *A.*2d at 1209. The township defended the distinction claiming that condominium assessments were higher than the apartments', resulting in apartments' generating less revenue. *Id.* at 571, 733 *A.*2d at 1215. *WHS Realty* makes clear that a methodology of taxation that creates a disparity in the amount of taxes collected is not a rational basis for a township to discriminate between similarly situated housing types.

The Borough argues that *WHS Realty* is distinguishable from the matter at bar because apartments and condominiums are taxed both on the value of land and structure; thus the only difference is how they are valued. Mobile home park taxation is based solely on the value of the land and improvements exclusive of the mobile homes. The distinction might have some validity if, in fact, the Borough could demonstrate that Barker's would be receiving services which it was not paying for through taxes. However, in this case, the Borough is given the luxury to remedy the disparity in taxes paid for the same municipal services being provided, a tool which the township in *WHS Realty* did not have.

Lakehurst has within its power the right to balance its tax collection to the extent it is providing equal services through the imposition of the municipal service fee. Therefore, it could include in its calculation of the fee the additional cost of providing garbage collection under the same terms and conditions that the town provides services to other residents who are similarly situated. Of course, if collection of the dumpsters on-site is not feasible, the

Borough would have the right to insist that the tenants within the park bring their garbage to a public street for collection just as any other resident receiving that service. *Pleasure Bay Apts. supra*, 66 *N.J.* at 85, 328 *A.*2d at 596. The net result would be that between the real estate taxes on the park property and improvements and the enhanced municipal service fee, the sole justification for the disparate treatment of mobile homes completely disappears.

The Mobile Home Taxation Commission Final Report noted the negative connotation that society has stamped upon mobile home ownership. That is one of the reasons for the Commission's use of the term "manufactured homes" rather than "mobile homes." Report at 2. The Report acknowledged the pleas of manufactured home owners that their homes were not trailers and that people should "look in these homes to see if [the occupants] were really transient 'gypsies' as many [people] believed." Report at ii.

There is no set of facts that could reasonably justify continuing the second class treatment of mobile home parks, with regard to garbage collection. "People are people," and the amount and type of garbage produced by all residential dwellings are the same. *WHS Realty Co., supra*, 323 *N.J.Super.* at 564, 733 *A.*2d at 1211. In fact, the collection of trash at the mobile home park could be easier for the Borough than it would be at single-family residences located elsewhere in the Borough since the garbage would be concentrated either at the dumpsters or in trash cans in close proximity at curbside.

Therefore, in light of the Borough's ability to offset the cost of collection through the municipal service fee and of its right to impose terms and conditions for the collection of the garbage which will result in the tenants being treated in the same manner as any other residential owner, there does not appear to be any justification which could conceivably support its decision not to provide garbage service to the tenants of the mobile home park.

The refusal to do so constitutes an invidious discrimination precluded by our law.