FREDERICK KOESTER, *ET AL.*, APPELLANTS, v. HUNTERDON COUNTY BOARD OF TAXATION, RESPONDENT.

Argued October 16, 1978—Reargued January 22, 1979— Decided March 20, 1979.

*Mr. Dennis L. Riley* argued the cause for appellants (*Messrs. Riley* and *DiCamillo,* attorneys; *Mr. Angelo J. DiCamillo* on the brief).

*Mr. Harry Haushalter,* Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

*Mr. Waldron Kraemer* argued the cause for Intervenor Borough of High Bridge (*Mr. Waldron Kraemer* and *Ms. Joan A. Lovell* on the brief).

*Mr. Daniel J. Matyola* argued the cause for Intervenors First National Bank of Central Jersey and Hunterdon Village Square (*Messrs. Wharton, Stewart & Davis,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The issue presented is whether the mobile homes in Solitude Village are taxable as real property within the contemplation of *N. J. S. A.* 54:4–1 *et seq.* The Appellate Division held that they are and thereafter this Court granted certification on the application of the mobile home owners. 76 *N. J.* 236 (1978). After argument and reargument we now affirm.

In 1972 Solitude Village, Inc. acquired a one-hundred acre tract of hilly wooded land in the Borough of High Bridge, Hunterdon County, which it proceeded to advertise and develop as "One of The Most Beautiful Mobile Home Villages in the East." It was specifically designed as a "permanent community" of mobile homes having all of the conveniences of modern conventional homes. Its original advertising brochure displayed model homes with basic prices ranging up to approximately $30,000 and it may be assumed that the prices are now significantly higher. One of the homes displayed contained as many as three bedrooms, two baths, kitchen, dining and living rooms, along with separate study and recreation rooms. The brochure stressed that the following were included in the price of "the home": "Attractive, well built, wood porches and large size decks for outdoor dining and lounging; 2-car paved parking for your home and ample guest parking nearby; Attractive pole light installed in front of your home; Pedestal mail box, with your name, installed in front of your home; Luxury wall-to-wall carpeting with double foam pad; Electric range

and refrigerator; Storm windows and screens; Plumbing and wiring for washer and dryer."

Solitude Village has approximately three hundred home sites, one hundred of which are now occupied by mobile homes. Although the record is somewhat obscure, it may readily be inferred that once a mobile home is placed on its site it is intended to and does remain there indefinitely. At the reargument, counsel for the present owner of Solitude Village stated that he was confident that there had been "no recent withdrawals" and he doubted "very, very much that there have ever been any mobile homes actually removed from the site."

Before any units were placed in the Village the acreage was prepared to accommodate a large community of mobile homes. There was engineering planning which included the marking of lot and street locations. Thereafter the hilly terrain was graded, roads were constructed, sewer and water lines were installed, power lines were established and drainage areas were prepared. Each individual site required considerable preparation before it could receive a mobile home. The trees and growth had to be removed, the boundaries had to be established and the support or foundation had to be laid. Mr. Frederick Baier, the original President of Solitude Village, Inc., testified that one of three types of foundation was used. In the "runner type" there were long concrete slabs, with stone underneath, supporting blocks which in turn supported the chassis or I-beam of the mobile home; in the "piling type" the blocks rested on pilings in the ground; the third variation was substantially a runner type accompanied by a retaining wall.

Mr. Baier also testified as to the manner in which the mobile homes were placed on or attached to their foundations. The home was first disengaged from the tractor which brought it to the site and was jacked up to permit removal of the wheels and axles. A bulldozer was used to place the home on its foundation and then certain interior and exterior work was required. After the home's I-beam was placed on

the foundation the weight of the home was generally sufficient to provide stability; however, there were hurricane straps attached to the home which had to be secured to bolts embedded in concrete in compliance with a High Bridge ordinance. Plywood skirting was often installed to conceal the concrete blocks and the various utilities in the home were appropriately connected with Solitude's central system.

The homes at Solitude Village are single width (12 feet), single width with an additional room, and double width (24 feet). The double width homes were brought to the Village in two sections which were connected at the site. They were bolted together and the roof connection was sealed by an aluminum flashing. Double width homes, which may in their current models be as large as twenty-eight feet in width and seventy feet in length, have been growing in popularity in Solitude Village, as well as elsewhere. See *B. Hodes & G. Roberson, The Law of Mobile Homes* at xxxvii (3rd Ed. 1974). It need hardly be pointed out that these double width homes are intended to remain on site permanently, and that their removal by cranes or other heavy machinery would undoubtedly entail considerable difficulty and oftentimes considerable damage to the landscape. Insofar as the single width homes are concerned their removal would also entail some difficulty since in their current models they may be as much as seventy feet long and fourteen feet wide. Here, as with the double width homes, the intent that they remain on site permanently is entirely evident.

Early in 1975 the tax assessor of High Bridge submitted a tax list to the Hunterdon County Board of Taxation which did not include any of the homes at Solitude Village. At the Board's preliminary equalization hearing, assessors from other municipalities within the County objected to the omission and thereafter the Board directed the High Bridge assessor to place the Solitude Village homes on the tax rolls. After hearing objections from residents of Solitude Village the Board reaffirmed its action. As of May 1, 1975 the homes

appeared on the Board's certified tax rolls and thereafter the residents of the Village received individual tax bills. As theretofore Solitude Village, Inc. was taxed on the land, foundations, streets, walks, sewers, water lines, etc. This aspect of the tax assessment is not disputed and is not placed in issue by the parties to this proceeding.

The Borough of High Bridge, Solitude Village, Inc. and 57 individual home owners appealed the assessments against the individual home owners to the County Board which sustained the assessments. On further appeals to the Division of Tax Appeals the County Board's judgment was affirmed in a full opinion, which found that the mobile homes were "dwellings in every sense of the word," that they were "not readily adaptable to being moved about," that they "were installed and completed in such a fashion that it was never intended, planned or expected that these dwellings would be moved," and that they were "so integrated with the land as to be considered as real estate and taxable as such within the meaning of our real estate tax statutes." See *Becker v. Little Ferry*, 125 *N. J. L.* 141, 143 (Sup. Ct. 1940), *aff'd* 126 *N. J. L.* 338 (E. & A. 1941).

The Appellate Division affirmed the Division of Tax Appeals substantially for the reasons set forth in the opinion filed by the Division. In addition the Appellate Division expressed the thought that the determination that "these mobile homes should be taxed as real property" was not inconsistent with *Nelson Cooney & Son, Inc. v. Tp. of So. Harrison*, 57 *N. J.* 384 (1971). There the Court, in a case dealing with the power of a municipality to license a mobile home park and impose a monthly fee for each occupied site within the park, expressed the view that mobile homes "are not taxable, under present statutes in this state, as either real or personal property." 57 *N. J.* at 389. The quoted language is undoubtedly too broad. It may be appropriate when sought to be applied to transient-type house trailers which have on occasion loosely been referred to as mobile

homes. *Cf. Manhattan Trailer Court v. Township of North Bergen,* 104 *N. J. Super.* 405 (App. Div. 1969). It would be inappropriate when sought to be applied to modern single or double width mobile homes placed on sites, either within or without mobile home parks, with a view toward their remaining there permanently as family dwellings. *Cf. Bell v. City of Corbin City,* 164 *N. J. Super.* 21 (App. Div. 1978).

The early house trailers, which originated a half century ago, have been described as makeshift contraptions "not really fit for permanent human habitation." Bartke & Gage, *Mobile Homes: Zoning and Taxation,* 55 *Cornell L. Rev.* 491, 525 (1970). That they were then viewed as personal property can have little relevance when dealing with modern mobile homes, such as those at Solitude Village. These modern homes not only have all of the facilities of conventional homes, including sewage, water, lighting, heating and air conditioning, but also are more and more being constructed to look like and be used as conventional homes. As such they should, in all fairness, bear similar tax burdens. *Bartke & Gage, supra,* 55 *Cornell L. Rev.* at 520, have properly noted that "the ideal for any tax system is to treat equally those similarly situated." See *Princeton Univ. Press v. Princeton,* 35 *N. J.* 209, 214 (1961). Since permanent home owners, whether their homes be described as conventional or mobile, receive the same municipal services, they should equally bear their respective burdens of the local real property tax. There should be no judicial reluctance to deal with mobile homes as realty for tax purposes once it is recognized that "mobile homes are, after all, *homes*" that "serve the same function as other housing." *Note, Toward an Equitable and Workable Program of Mobile Home Taxation,* 71 *Yale L. J.* 702, 717 (1962).

In many states the subject has been specifically dealt with by legislation though in varying fashion. See *B. Hodes & G. Roberson, supra,* at 155 *et seq.; Shepard's Mobile Homes and Mobile Home Parks,* 84–85 (1975). In our neighboring states mobile homes have been, for tax purposes, dealt with

as real property. *N. Y. Real Property Tax Law* § 102.(12) .(g) (McKinney 1972); *Pa. Stat. Ann.* tit. 72 § 5453.201 (Purdon 1978–79 Supp.); *Del. Code Ann.* title 14 § 1930 (1978 Cum. Supp.). There appears to be a like movement throughout the country. See *Note, Housing — Mobile Homes — Some Legal Questions*, 75 *W. Va. Law Rev.* 382, 389 (1973); *Note, supra*, 71 *Yale L. J.* at 715; *cf. Bartke & Gage, supra*, 55 *Cornell L. Rev.* at 520:

[I]n recent years a trend has been apparent in the direction of taxing mobile homes as real estate, which should be the goal of all the states, so that mobile home dwellers contribute their fair share to the support of the local services that benefit them.

See *Appeal of Lantz*, 199 *Pa. Super.* 310, 184 *A. 2d* 127 (1962).

New York's statutory treatment of mobile homes as real property for tax purposes has been judicially applied and upheld. See *Beagle v. Douglas*, 2 *Misc. 2d* 361, 157 *N. Y. S. 2d* 461 (*Sup. Ct.* 1955); *Feld v. Hanna*, 4 *Misc. 2d* 3, 158 *N. Y. S. 2d* 94 (Sup. Ct. 1956); see also *New York Mobile Home Assoc. v. Steckel*, 9 *N. Y. 2d* 533, 215 *N. Y. S. 2d* 487, 175 *N. E. 2d* 151 (1961), *app. dismissed* 369 *U. S.* 150, 82 *S. Ct.* 685, 7 *L. Ed. 2d* 782 (1962). In *Feld v. Hanna, supra*, the Court pointed out that the expanding use of mobile homes had been accompanied by the greater need for "police and fire protection, sanitation supervision, schools, courts, and other governmental services" and that the Legislature had directed that the homes be assessed as real property in order that their owners may be forced to pay "their fair share of the real estate taxes." 158 *N. Y. S. 2d* at 96.

When dealing with other movable structures having incidents comparable to mobile homes, the New York courts have also found them to be real property for tax purposes. Thus, in *People ex rel. Herzog v. Miller*, 170 *Misc.* 1063, 11 *N. Y. S. 2d* 572 (Sup. Ct.), *aff'd*, 258 *App. Div.* 724, 15 *N. Y. S. 2d* 141 (1939) a lunch wagon was held to be taxable as real property. The Court pointed out that in accordance with the

agreement between the owner of the land and the owner of the lunch wagon, the lunch wagon could be removed at the expiration of the lease term. Nonetheless it was held taxable as "real property" for, as the Court said:

Every requisite of a permanent structure is incident to and connected with this building. It has a foundation imbedded and built in the soil. It has all the connections necessary by way of being supplied with power, gas and sewage facilities in the same manner that any permanent structure would have. The sole difference is that it may be removed intact from its foundation. * * * It would be manifestly unfair to other taxpayers to permit a structure like this which is often a source of considerable revenue to be tax exempt when there is no such exemption in the Tax Law.

11 *N. Y. S. 2d* at 573.

In *Fedders Cent. Air Cond. v. Karpinecz & Sons, Inc.,* 83 *Misc. 2d* 720, 372 *N. Y. S. 2d* 470 (Civil Ct. of N. Y. 1975) the Court, in holding that a diner constructed at a factory and thereafter placed on its site was real property within New York's Lien Law, stated that while there may have been a time when a diner was properly viewed as personal property, that was no longer true, considering the substantiality and permanency of the modern diner. The distinction between the old and the new type of diner may be viewed as comparable to the distinction between the travel trailer and the modern mobile home. See *Ellis v. Board of Assessors,* 358 *Mass.* 473, 475, 265 *N. E. 2d* 491, 493 (1970) : "[T]he travel trailer and mobile homes have become two different products." It is interesting to note that in *Becker v. Little Ferry, supra,* Justice Bodine, speaking for the Court of Errors and Appeals, took occasion to refer approvingly to *Comstock v. Town of Waterford,* 85 *Conn.* 6, 81 *A.* 1059 (1911), where the Court held that summer cottages supported upon chestnut posts set into the ground were taxable as real estate even though they were on leased ground with the privilege of removal. 126 *N. J. L.* at 339.

Unlike our neighboring states, New Jersey has thus far made no legislative attempt to deal specifically and compre-

hensively with mobile home taxation. It has adopted the "Uniform Standards Code for Mobile Homes Act" (*N. J. S. A.* 52:27D–25.1 *et seq.*), which carefully differentiates travel trailers designed as temporary dwellings for travel, recreational and vacation use, from mobile homes designed to be towed to their sites and "connected to utilities for year-round occupancy." *N. J. S. A.* 52:27D–25.2. The Code prescribes construction standards but does not purport to deal with taxation, thus leaving that subject to our general taxing statute (*N. J. S. A.* 54:4–1 *et seq.*). That statute provides in universal terms that "all property real and personal" not expressly exempted or expressly excluded shall be subject to taxation. Statutory amendments have largely confined personal property taxation to certain kinds of property used in business. See *N. J. S. A.* 54:4–9 *et seq.*; *Nelson Cooney & Son, Inc. v. Tp. of So. Harrison, supra,* 57 *N. J.* at 389 *n.* 2. These amendments do not concern us here for admittedly we are not dealing with "personal property used in business." *City of Bayonne v. Port Jersey Corp.,* 79 *N. J.* 367, 372 (1979). Our concern is simply whether our broad statutory provisions, which embody no pertinent exemptions and clearly subject all conventional homes to local real property taxation, apply equally to mobile homes of the type found at Solitude Village.

Though the reports are full of cases dealing with rules of statutory interpretation, no purpose would be served by outlining them here. In *J. C. Chap. Prop. Owner's etc. Assoc. v. City Council,* 55 *N. J.* 86, 100 (1969) we pointed out that proper statutory interpretation will ultimately turn "on the breadth of the objectives of the legislation and the commonsense of the situation." See *Clifton v. Zweir,* 36 *N. J.* 309, 322–23 (1962); *cf. 2A Sutherland, Statutory Construction* (4th ed. 1973), § 54.05 at 361: "Statutes imposing taxes and fees are commonly given extended interpretation in accordance with the spirit of the legislation."

*N. J. S. A.* 54:4–23 directs that each parcel of "real property" be assessed for taxation at its full and fair value. It does not embody any statutory definition but the courts have properly given it expansive meaning in the light of the broad legislative objectives. Thus, the parcel referred to has been held to include the land and its "concomitant improvements." *City of Newark v. West Milford Tp., Passaic County,* 9 *N. J.* 295, 304 (1952). And the aggregate tax is a lien on the entire fee even where there is separate ownership of the land and the improvement. *Crewe Corp. v. Feiler,* 28 *N. J.* 316, 320 (1958); *Becker v. Little Ferry, supra,* 126 *N. J. L.* 338. Principles of fairness and equality are, of course, implicit throughout the legislation; as Chief Justice Weintraub put it when dealing with constitutional principles in *Switz v. Kingsley,* 37 *N. J.* 566, 572 (1962): "The thought is that things equal to each other in the context of the local real property tax involved [should] be treated equally." The homes at Solitude Village and the conventional homes in the municipality are, in the present taxation context, alike and should be dealt with alike. Indeed it would be incongruous to exempt the Solitude Village mobile home owners from the local real property tax burdens since they receive municipal services identical with those received by their taxpaying neighbors who own conventional homes. We are satisfied that only by treating them alike will the letter and spirit of the statute be observed.

The mobile home owners have stressed that their homes are on leased land and that although they have renewal options they also have the privilege of removal. But that does not alter the fact that while their homes remain at Solitude Village they constitute land improvements taxable as real property. Indeed there are many buildings throughout the State which have regularly been dealt with for tax purposes as land improvements though they stand on leased land and are subject to private contractual arrangements embodying, *inter alia,* the privilege of removal. In *Becker v. Little Ferry, supra,* 125 *N. J. L.* at 144, the former

Supreme Court pointed out that while "it is quite within the law" for parties to make such an arrangement, the land and the building remain taxable as real property. On appeal, the Court of Errors and Appeals affirmed in an opinion which pointed out that while in this State "the assessor values land and buildings separately," (*N. J. S. A.* 54:4–26) the total is "the assessed value of the parcel." 126 *N. J. L.* at 339.

In *Becker* the local assessor had for years assessed the value of the building to its owner and the value of the leased land on which it stood to its owner. The Court of Errors and Appeals held that notwithstanding this practice, the landowner remained liable for the tax on the entire parcel including the building, pointing out that "the municipality in assessing land is not obliged to cast around to see who has a leasehold interest therein." 126 *N. J. L.* at 340. While a municipality "is not obliged" to send separate tax bills to the respective owners of the building and the land, we find nothing in *Becker,* or in reason, for precluding it from doing so without waiving the municipality's lien on the land and its improvements for the total assessed value of the parcel.

The Borough of High Bridge has urged the Court to permit it to continue to assess the mobile home owners individually, pointing out that "to do otherwise will unfairly deprive these older people of valuable federal and state income tax deductions." Since it is willing to undertake the incidental administrative burdens, we see no reason why the Borough's discretionary authority to do so should not be recognized, bearing in mind that the tax revenues will remain fully protected by virtue of the holding in *Becker v. Little Ferry, supra,* 126 *N. J. L.* 338, which we support. See *New York Mobile Homes Ass'n. v. Steckel, supra,* 9 *N. Y.* 2d at 539, 215 *N. Y. S.* 2d at 491, 175 *N. E.* 2d at 154.

The home owners have raised additional issues which are not involved in this proceeding. Though they are not ripe for determination on the record here, they do suggest the

need for early legislative consideration in the light of our holding today. The Borough of High Bridge had adopted a mobile home ordinance which imposed upon the home owners substantial license fees geared to the costs of local government. This was done originally on the assumption that the homes would not be taxable as real property. Since they are now being so taxed the Borough concedes that its present license fee requirements would in effect amount to double taxation and should be eliminated. Accordingly it has suspended their collection, and we understand steps will be taken to alter the ordinance so as to bring it within legal limits. See *Salomon v. Jersey City*, 12 *N. J.* 379, 390–393 (1952); *cf. Nelson Cooney & Son, Inc. v. Tp. of So. Harrison, supra*, 57 *N. J.* at 393–394.

█ The mobile home owners point out that each of them was required to pay a sales tax at the time the home was originally purchased. We are not called upon in this case to pass on any questions under the Sales and Use Tax Act. *N. J. S. A.* 54:32B–1 *et seq.* The home owners are, of course, at liberty to renew their claims for refunds thereunder asserting, *inter alia*, that the Act did not contemplate that sales taxes would be due from home owners whose homes were constructed and intended at inception to be attached to realty and thereby subjected to real property taxes. Incidentally, it may be noted that there undoubtedly have been many instances in which sales taxes have been paid on personal property later incorporated into or attached onto real estate thereby increasing its assessed valuation.

█ The mobile home owners have referred to various provisions of the Motor Vehicle Act. Those provisions relate to "vehicles" defined in *N. J. S. A.* 39:1–1 as devices in which "a person or property is or may be transported upon a highway." See *N. J. S. A.* 54:4–3.21. Mobile homes constructed and intended at inception to be attached to realty and transported by special permit would hardly seem to fit the statutory definition. However, we need not pursue the matter other than to say that we find nothing in the Motor Vehicle

Act or elsewhere which would evidence any legislative intent to preclude on site real property taxation of mobile homes permanently attached to realty as in Solitude Village.

The mobile homes at Solitude Village were generally financed by security agreements which were apparently executed and filed under the Uniform Commercial Code. See *N. J. S. A.* 12A:9–201 *et seq.;* 12A:9–313; 12A:9–401; Kratovil, *The Uniform Commercial Code and The Real Property Lawyer,* 18 *DePaul L. Rev.* 101 (1968). Questions may be raised as to whether mobile homes constructed and intended at inception to be attached to realty, should not be financed in the same manner as conventional homes. The subject was not dealt with below and is not properly before us for determination. In any event it should more appropriately be dealt with in comprehensive legislation applicable to mobile homes. So far as the mobile home owners at Solitude Village are concerned, we were told at the reargument that they may have the opportunity of becoming part of the condominium which has been initiated by the new corporate owner of the Solitude Village development. Its counsel advised that a deed has already been filed under the 'Condominium Act (*N. J. S. A.* 46:8B–1 et seq.) and that one of the main purposes in converting to a condominium was to enable "financing at mortgage interest rates which will make the units more marketable."

Strictly the record before us calls only for a determination as to whether the lower tribunals erred in holding that the mobile homes were taxable as real property. On that score there can hardly be any room for doubt for, as counsel for the appellant home owners acknowledged at oral argument, "Solitude Village is probably the most perfect place you can pick as far as to say mobile homes are attached permanently." We find no error in the proceedings below and accordingly the judgment entered in the Appellate Division is:

Affirmed.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, JACOBS, PASHMAN, CLIFFORD, SCHREIBER and HANDLER—7.

*For reversal*—None.