Merchants Loan & Trust Co., Executor, Appellee, v. Mer=
chants Safe Deposit Co. et al.

On Appeal of Charles B. Pike, Appellant.

Gen. No. 16,010.

Same, Appellee, v. Merchants Safe Deposit Co., Appel=
lant.

Consolidated for Hearing.

Gen. No. 16,011.

1. Fixtures—*when safety deposit boxes not.* *Held,* that safety
deposit boxes not attached to the realty except by their own weight
and not attached to each other, were, *prima facie,* not fixtures.

2. Fixtures—*effect of acceptance of lease upon right of removal.*
After trade fixtures have been placed in demised premises, to accept
a lease which does not contain a clause authorizing their removal is
to waive such right. *Held,* however, that this rule does not apply ·to
the safety deposit boxes in question in this case.

Appeal from the Superior Court of Cook county; the Hon. George
A. Dupuy, Judge, presiding. Heard in the Branch Appellate Court
at the October term, 1909. Reversed and remanded. Opinion filed
February 13, 1912. ·

Statement by the Court. The two causes above en-
titled have been consolidated for hearing and argued
as one. They are the separate appeals of the Mer-
chants Safe Deposit Company and of Charles B. Pike
from a judgment for $5,000 rendered against them
jointly in the Superior Court upon a single cause of
action. In his declaration the plaintiff alleged, among
other things, that he was the owner of 2,226 safe de-
posit boxes located in the basement of the premises 78
to 82 LaSalle street, and that the defendants without
leave or license and against the plaintiff's will took,
·carried away and converted to their own use the said
boxes. The defendants deny in their pleas that these

boxes were the property of the plaintiff, and deny that he was entitled to them. The material facts are in substance as follows:

In 1884 the Merchants National Bank of Chicago was the owner of the land and building thereon known as 78 to 82 LaSalle street, Chicago. It occupied the main floor of said building for banking purposes. Before that date the basement of the building had been fitted with a safety deposit vault and appliances for carrying on a safety deposit business, and was leased to, occupied and used by, the Merchants Safe Deposit Company, one of the appellants herein, until 1903, apparently under a verbal lease. The vault referred to was constructed of steel, extended from the floor to the ceiling of the basement, and was equipped with steel doors, time locks and usual devices for protecting the vault and its contents. Within the vault were four rows of safe deposit boxes arranged in pairs on either side of a passage. It is not disputed that three of these rows of boxes were the property of the landlord and were a part of the realty. There was however an additional row of boxes composed of and containing the 2,226 safe deposit boxes now in controversy. These last mentioned boxes were not in the vault when the Merchants Safe Deposit Company first became a tenant of the premises, but had been purchased by said tenant on or about May 20, 1884, from the Diebold Safe & Lock Company for the sum of $8,000 and paid for by said tenant with its own money. These boxes now in controversy were installed or set up in place along the south wall of the vault by the Merchants Safe Deposit Company. They were made in sections and were not fastened in any way to the vault or building. There were twelve of these sections, and the boxes were set one on top of the other and kept in place by their own weight. It is said they weighed 46,000 pounds and were accurately fitted into the space

which they occupied and for which, it is said, they were specially constructed. When these boxes were purchased by the Safe Deposit Company in May, 1884, the Merchants National Bank, then the landlord, and the Merchants Safe Deposit Company, then the tenant, were in part under the same management, the president of the Bank being also president of the Safe Deposit Company, and the Deposit Company being tenant of the Bank which owned the premises. In 1903 the appellant, Charles B. Pike, acquired the majority of stock of the Deposit Company and became its president. June 15, 1903, the Merchants National Bank, then owner of the premises, executed and delivered a new written lease to the Safe Deposit Company of the premises and property described therein as follows:

"The entire basement now occupied by the Merchants Safe Deposit Company of the premises known as Nos. 78, 80 and 82 LaSalle street in said city of Chicago, including all vaults, storage boxes and safe deposit boxes therein, together with the office furniture and fixtures enumerated in the inventory annexed hereto and made a part hereof, to be occupied as safe deposit vaults and for no other purpose."

The lease contains a covenant that "upon the termination of this lease in any way the tenant will yield up said premises and said furniture and fixtures to said party of the first part in good condition and repair."

May 24, 1907, the Merchants National Bank had sold and conveyed to appellee, Lambert Tree, the premises, including the building, the basement of which had been leased as above stated and was occupied by the appellant Safety Deposit Company.

July 26, 1907, the lease of these premises to the Safe Deposit Company was assigned to the city of Chicago with the consent of appellee, Lambert Tree, who had purchased and became the owner of the fee.

It was while the negotiations resulting in this assignment were in progress, that Mr. Pike, defendant herein and then president of the Safe Deposit Company, informed Mr. Howard G. Grey, agent of the plaintiff, Lambert Tree, that the 2,226 safe deposit boxes now in controversy had been bought and paid for by the Merchants Safe Deposit Company, the tenant, and claimed that said boxes belonged to that Company and not to the landlord, the Merchants National Bank, nor to Mr. Tree, the purchaser of the premises and assignee of the lease from the bank. The assignment of the lease of the premises occupied by the Safe Deposit Company to the city of Chicago was dated July 26, 1907, and provided that "All the safe deposit boxes in said demised premises, which the Merchants Safe Deposit Company may have broken open or may hereafter break open (except 2,226 numbered 3,313 to 5,538 both inclusive) shall be immediately repaired by said company with respect to the damage caused by said breaking open." An exactly similar provision is contained in the written consent of Lambert Tree, also dated July 26, 1907, to the assignment of the same lease to the city of Chicago and hereinafter referred to.

Thereafter on or about August 8, 1907, the Merchants Safe Deposit Company sold to a third party— the Donnell Safe Company—for $1,800 the 2,226 safe deposit boxes; and on or about the 21st of the same month the purchaser—Donnell Safe Company—began to remove and did remove the 2,226 boxes in controversy, which were subsequently overhauled and resold by the Donnell Safe Company.

NEWMAN, NORTHRUP, LEVINSON & BECKER, for appellants; CHESTER E. CLEVELAND, of counsel.

McCULLOCH & McCULLOCH, TENNEY, COFFEEN, HARDING & SHERMAN, for appellee; HORACE KENT TENNEY, of counsel.

MR. PRESIDING JUSTICE FREEMAN delivered the opinion of the court.

It is contended, among other things in behalf of appellants, that the 2,226 safe deposit boxes in question were personal property of the appellant Merchants Safe Deposit Company and were not fixtures or real estate, and that such is the presumption of law; that the question of ownership of these boxes was one of fact, which should have been submitted to the jury; and that appellee Tree is estopped to assert ownership of these boxes, because he remained silent when he should have asserted his claim to the boxes if had any.

As to the first of these contentions, the reply of appellee in substance is that the basement containing the vault in which the 2,226 boxes in controversy were placed was equipped by the landlord with a homogeneous plant devoted to the purpose of carrying on a safe deposit business; that this equipment consisted of an outfit of steel boxes purchased and owned by the landlord, conceded to be part of the realty and not now in controversy; that subsequently the tenant extended the capacity of this plant by additional fixtures—being the 2,226 boxes now in question—of the same character, made to match the original equipment of boxes, fitted accurately to a special place along the wall of the vault and put in place in the same manner as the others; that the fixtures thus added became a part of the realty which the tenant had under no circumstances the right to remove. In the case of Arnold v. Crowder, 81 Ill. 56, 58, the Supreme Court says: "Perhaps the true rule is that articles not otherwise attached to the land than by their own weight are not to be considered as part of the land unless the circumstances are such as to show that they were intended to be part of the land, the *onus* of showing they were so intended lying on those who assert that they

have ceased to be chattels; and that on the contrary
an article which is affixed to the land even slightly, is
to be considered as part of the land unless the circum-
stances are such as to show that the article was in-
tended all along to continue a chattel, the *onus* similar-
ly lying on those who contend that it is chattel.'' To
the same effect is the statement in 19 ''Cyc.,'' p. 1036,
in part as follows: ''It is believed that the true rule
is that articles not otherwise attached to realty than
by their own weight are *prima facie* personalty and
articles affixed to land in fact although only slightly
are *prima facie* realty and that the burden of proof is
on the one contending that the former is realty or that
the latter is personalty.'' In 19 Cyc., p. 1038, it is
said that if we ''inquire what facts may be shown to
rebut these presumptions,'' such ''facts relate to two
principal matters, viz, the act of annexation and the
parties concerned. The former concerns the degree
of annexation, the adaptability of the article to the
realty and the intention with which the annexation was
done. The latter concerns the relation of the inter-
ested parties to the realty and to the chattels.''

The 2,226 boxes in controversy were not otherwise
attached to the realty than by their own weight. They
were so built and fitted together as to make each box
a part of the whole 2,226 boxes for use for safety de-
posit purposes; but they were not fastened to each
other or the realty and could be and were when finally
moved, detached each from the others and carried out
as separate boxes through the door space of the vault.
In the view of the law as above stated by the Supreme
Court the presumption is that in the absence of cir-
cumstances tending to show that they were intended to
be part of the realty, the *onus* of showing these boxes
were so intended rests upon the appellee, who is now
asserting that they had ceased to be chattels. The
boxes as above stated were bought for $8,000 and paid

for by the Safe Deposit Company out of its own funds, and were never attached in any way, save by their weight to the vault or building or ground.  So far as these facts go they tend to show that the boxes were not even "trade fixtures."  In Watriss v. First National Bank of Cambridge, 124 Mass. 571-578, the opinion concludes as follows:  "If any of the articles named were movable chattels as the defendant contends, the plaintiff cannot recover for them; but if they were permanent or trade fixtures, the plaintiff may recover for their removal;" thus making the distinction between "movable chattels upon the premises" and "trade fixtures put in by the * * * bank." *Idem* p. 574.  The case holds that "when the same tenant continues in possession under a new lease, containing different terms and conditions, making no reference to the old lease, reserving no rights to the lessee in fixtures annexed during the previous term and not removed before its expiration and containing the covenant to deliver up the premises at the end of the term in the same condition," there is a "creation of a new tenancy," that "the occupation is in effect a surrender of the premises to the landlord under the old" (*Idem* p. 576-577), and the right to removal of trade fixtures annexed to the premises is lost to the tenant "notwithstanding his occupation has been continuous."    *Idem* p. 578.

But a "trade fixture" does not necessarily become a fixture at all unless it is in some respect annexed or an intention is shown to permanently annex it to the premises.  Such "intention must be definitely expressed by words or acts."  Bouvier's L. Dic., Fixtures. "By actual annexation is understood every mode by which a chattel can be joined or united to the freehold. The article must not be merely laid upon the ground; it must be fastened, fixed, or set into the land or into some such erection as is unquestionably a part of the

realty; otherwise it is in no sense a fixture." *Idem.* In the case at bar it is conceded there was no actual annexation of the boxes in question to the vault or premises.

It is claimed however that when on June 15, 1903, 19 years after the 2,226 boxes in controversy had been put into the vault by the Merchants Safe Deposit Company, a new lease was taken by that Company which did not reserve to the tenant any right of removal of the said boxes, said boxes then became as trade fixtures a part of the subject-matter of the new demise, and that by the acceptance of such new lease without reserving such right of removal the Safe Deposit Company relinquished its right in the fixtures to the landlord. This is undoubtedly the law, if these boxes were "trade fixtures." Sanitary Dist. v. Cook, 169 Ill. 184-190-195. Watriss v. First National Bank, 124 Mass. 571, *supra.* It is urged also that these boxes were expressly devised by the terms of the lease itself, which includes in the description of the leased premises "the entire basement * * * including all vaults, storage rooms and safe deposit boxes therein." The words "all * * * safe deposit boxes therein" undoubtedly cover the 2,226 boxes in controversy which were then in the vault in said basement and had been there in use for about nineteen years. The acceptance of a lease containing this language standing by itself seems to be a recognition of the right of the lessor to these boxes and of its right to lease them. If however they were not "trade fixtures," but were the personal property of the lessee and conceded to be such personal property, the use of such words alone would not probably be held to constitute a conveyance of such personal property to the landlord. The words "all safe deposit boxes" would be deemed probably to refer only to all such boxes as the landlord had a right to lease. What boxes the landlord could thus lease is

clearly a question of fact and there is evidence tending to show that neither lessor nor lessee at that time or subsequently intended the lease to cover any boxes save such as were and always had been the property of the lessor, which there is evidence tending to show was not true of the 2,226 boxes in controversy. Up to that time these last mentioned boxes according to this evidence were and always had been the property of the lessee, bought by the latter, paid for with its own money, placed by it in the vault and used in its own business.

There was also introduced in evidence a consent by the plaintiff—appellee herein—to the assignment of the lease under consideration to the city of Chicago bearing date July 26, 1907. This consent given by appellee as assignee of the original landlord contains the following:

"I hereby certify that all the personal property mentioned and described in said lease has been duly surrendered and delivered to and is now held by me as assignee of said The Merchants National Bank of Chicago and as owner of said Deposit Company lease and is no longer a part of said lease. All the safe deposit boxes in said demised premises which the Merchants Safe Deposit company may have broken open or may hereafter break open (except 2,226 boxes numbered 3,313 to 5,538 both inclusive) shall be immediately repaired by said Company with respect to the damage caused by such breaking open."

This consent to the assignment of the lease to the city of Chicago is signed "Lambert Tree, by Howard G. Grey, his attorney in fact."

The evidence, it is contended, tends to show that the 2,226 boxes in controversy had not been surrendered or delivered to Mr. Tree and were not held by him as assignee of the Bank then or at any other time, and that the contract to repair boxes injured by the Safe Deposit Company in getting out the property of depositors therein and breaking open boxes for that pur-

pose was expressly confined to boxes other than the 2,226 in controversy.

It is urged in behalf of appellants that in view of this and other evidence, a question of fact as to the ownership of these 2,226 boxes was raised, which should have gone to the jury, and that the trial court erred in giving the jury the following instruction:

"As to the plaintiff's first claim, the court instructs you that under the evidence in this case the title to those boxes was in the plaintiff and that the defendant had no right to sell them or to have removed them from the premises, and if you find from the evidence that they did so, then they are liable to the plaintiff for such damage as you find from the evidence was caused thereby."

We are of opinion the objection is well taken. There is conflicting evidence upon the question of title which should in our opinion have been submitted to the jury under proper instructions as to the law applicable. The ownership of the boxes in controversy is not merely a question of law but also one of fact. The intention and understanding of the respective parties is material as to ownership and the evidence presents a question for the jury. Hewitt v. General Electric Company, 164 Ill. 420; Crerar v. Daniels, 209 Ill. 296, cited by appellants' counsel, are we think in point. The determination as a matter of fact of the question of ownership of the boxes has bearing upon the question of defendants' liability.

Other points are discussed by counsel, but inasmuch as the case must be sent back for a new trial for reasons indicated, we deem it unnecessary now to prolong the discussion.

The judgment of the Superior Court will be reversed and the cause remanded.

*Reversed and remanded.*