AYRSHIRE COAL COMPANY, Division of American Metal Climax, Inc., Plaintiff-Appellee, *v.* PROPERTY TAX APPEAL BOARD *et al.*, Defendants-Appellants.

(No. 73-142; )

Third District—April 17, 1974.

*Rehearing denied May 27, 1974.*

William J. Scott, Attorney General, of Chicago, and Robert Downs, State's Attorney, of Lewistown (Michael B. Weinstein, Assistant Attorney General, of counsel), for appellants.

Ralph Froehling, of Canton, for appellee.

Mr. JUSTICE DIXON delivered the opinion of the court:

This action was brought under the Administrative Review Act. (Ill. Rev. Stat. 1969, ch. 110, sec. 264 *et seq.*) to review a decision of the Property Tax Appeal Board, an administrative agency of the Department of Local Government Affairs of the State of Illinois which approved the assessment classification of certain heavy machinery and equipment in the preparation plant located at the Sunspot Mine in Fulton County and owned by Ayrshire Coal Company. The Circuit

Court of Fulton County reversed the decision of the Property Tax Appeal Board. It is from that judgment that this appeal is taken.

The Board of Review of Fulton County assessed the heavy machinery and equipment of the preparation plant as real property for the 1970 assessment. The Sunspot Mine, of which this preparation plant is a part, has been in existence since the early 1960's. The heavy machinery and equipment from 1964 to 1969 had been assessed as personal property. Ayrshire appealed the 1970 assessment by the Board of Review to the Property Tax Appeal Board which upheld the assessment. Ayrshire then petitioned for administrative review.

The preparation facilities involved served two general purposes, they size the coal to meet customer specifications and they perform a cleaning operation. Raw coal is received from the mine via trucks and is dropped into a 250-ton hopper, from there it travels by conveyor belt to a rotary breaking unit, which reduces the size of the coal to 6 inches. It then travels to washing areas and there is screened into 3 sizes. The 2 larger sizes are distributed then via a drag conveyor to two identical but separate cleaning units which are simply big tanks in which a high specific gravity liquid (water and magnetite) allows coal to float while impurities such as slate, rock, etc., sink to the bottom. A conveyor skims off the surface. The finest-size coal is processed to a settling pond and from it pumped back to the top level of washing equipment where it passes through two cyclone cleaning units. Both the clean coal and rejects from all three factors travel over a series of rinsing screens in order to recover the magnetite which is expensive and also undesirable in the clean coal product. The magnetite material circulates to a unit where the magnetite settles out, clean water overflows and is recycled through rinsing. The magnetite is pumped to storage and reused.

The largest-size coal goes through a two-stage crusher. The intermediate size goes to another screening section or to a heat-drying unit. The smallest size goes to a centrifugal-drying unit where moisture is reduced and then to storage or heat drying. From storage all coal goes to a loading section by conveyor belt where it can be loaded on one or two railroad tracks for shipment. Then there is an oil-treating system for dust control as the freight cars are loaded.

The system described by the witness includes the 250-ton hopper (conceded to be part of the real estate) and 9 conveyors, the drag conveyors, 1 rotary breaking unit, 6 double-decked inclined fibrating screens, 10 centrifugal pumps, 2 dense-media baths, 2 cyclone-heating units, 1 heat-drying unit, 1 centrifugal drying unit, 3 roll crushers, 1 ring mill crusher, 1 hammermill crusher, 1 thickener unit, 5 collecting

sumps, 3 storage bins, 3 automatic belt scale units, a 200-horsepower squirrel-cage exhaust fan added to the drying unit, pump for fire protection, and 1 oil-treating system. All of the equipment is attached, either by nuts and bolts or welded, to supporting piers or foundations which, in turn, are firmly attached to the realty to prevent vibration and movement. Other than some conveyors the equipment is sheeted from the weather (enclosed in). Land on which the structures set is, and at all times was, owned in fee by Aryshire. Photographs also show a shop, warehouse, garage and office complex which are conceded to be real estate. The concrete foundations to which equipment is bolted or otherwise attached are conceded to be real estate. The height of the main washing area plant is 65 feet, the height of the storage bins is 100 feet.

It is expected that the mine itself will run out of coal in 4 or 5 more years and the plant will then be moved to a new location. The plant can be moved but could take up to several years to do so. It would have to be dismantled to do so as it was not designed to be moved.

Exhibit 3 shows a 6-story building with windows at each level. *This structure is claimed to be personal property.*

Associated with the machinery is the necessary structural steel. The complex appears to cover hundreds of feet and overlaps two townships but the two separate assessments are consolidated in this case. The total assessed value of the items in question is $484,950.

At the time the complex was first erected some of the machinery came from other Aryshire locations but some was specially designed and built by McNally-Pittsburgh Company who then erected the complex under a conditional sales agreement which provided that no item furnished should be considered a fixture and *that any part may be separated from such real estate* for the purpose of repossession. (Emphasis supplied.)

By 1970, McNally-Pittsburgh had been paid in full and the agreement was no longer in force.

At the hearing before the Property Tax Appeal Board, Aryshire contended that the machinery, equipment and structural steel in the preparation plant remain personal property because:

1. Of the conditional sales agreement with McNally-Pittsburgh.
2. The plant, while physically annexed to the real estate by bolts to concrete piers and while some machinery and equipment is welded to "I" beams for stability purposes each individual item can be removed without damage to the real estate.
3. Some machines and equipment have been moved in and out.
4. Previous acceptance by the Board of Review of the plant as personal property from 1961 through 1969.

The opponent contended that:

1. The conditional sales agreement was only binding on the parties while it was in force.
2. The previous assessment was done by the assessor. The Board of Review has authority each year to classify property.
3. That the only real question is whether for the purposes of taxation the property should be assessed as real estate and that based on Illinois Law and on the Illinois Property Appraisal Manual the property is properly assessed as real estate.

William Townsley, a valuation consultant for the Department of Local Government Affairs testified after a thorough and extended inspection of the plant that he believed the property to be real estate. He testified that the machinery and equipment was in a building.

In its opinion the Appeal Board placed particular emphasis on the fact that Ayrshire owned the land and the plant and that the heavy machinery and equipment was indispensable to the operation of the preparation plant.

On review the trial court rejected the findings and opinion of the Appeal Board as being against the manifest weight of the evidence and not supported by competent or substantial evidence. The court, in its opinion, (1) rejected the testimony of Townsley, (2) found that the use was not permanent, (3) that the "housing" of the machinery were not "buildings", (4) that prior action of assessing as personal property must be taken as some evidence that the property is personalty and that (5) the housing—the shelter is secondary in that the machinery and equipment is the plant and that the sheet metal is attached to the structural framework that supports the machinery as distinguished from the usual situation where machinery is attached to, or installed in, a building.

The principles of law applicable to the review of the findings and decision of an administrative agency are well settled and have been succinctly stated in *Kelley v. Civil Service Com.*, 31 Ill.App.2d 115, 116-117. They need not be re-stated here.

Section 1 of the Revenue Act of 1939 (Ill. Rev. Stat. 1969, ch. 120, sec. 482 (13) defines real property as follows:

"Not only the land itself, * * *, but also all buildings, structures and improvements, and other permanent fixtures, of whatsoever kind, thereon * * *."

An examination of the Annotated Statutes (S.H.A. ch. 120, sec. 482(13)(1970)) discloses but three cases. The first states that, "Persons dealing with land and improvements thereon may consider a building thereon as personalty for their purposes, but such treatment, as between

individuals, does not change essential characteristics of building as realty." *United States v. 19.86 Acres,* 141 F.2d 344, 151 A.L.R. 1423. The second states, "Poles and towers and electrical wires thereon for power transmission * * * are, for purpose of taxation, real estate, within provision of this section, providing that the term 'real estate' shall include land and the structures and fixtures thereon." (*Sanitary District v. Young,* 285 Ill. 423.) In that case some were ordinary wooden poles set in the ground, others were steel towers set in concrete bases, all on land owned by the District. The third case involved a tunnel and has no application here.

A structure has been defined in the broad sense as any construction or piece of work composed of parts joined together in some definite manner. Any form or arrangement of building or construction materials involving the necessity or precaution of providing proper support, bracing, tying, anchoring, or other protection against the pressure of the elements. (Ballantine Law Dictionary.) The term ordinarily carries with it the idea of size, weight, and strength * * * and has come to mean anything composed of parts capable of resisting heavy weights or strains, and artificially joined together for some special use. 83 C.J.S., *Structure.*

In a discussion as what structures may be regarded as permanent, it was said in *Kankakee and Seneca R.R. Co. v. Horan,* 131 Ill. 288, 301, "It can not be doubted that the road-bed, embankments, trenches, bridges, culverts and other appurtenances of a railroad constructed and maintained in pursuance of lawful authority, are to be regarded in law as permanent structures. This is not so because it is certain that they will in fact continue to subsist in their present condition forever, or that they are not liable to be changed in many respects by the proprietors * * * whenever they may see fit, or by natural causes, but *it is so because the railroad company has a legal right to maintain them perpetually. * * *.*" Emphasis supplied.

"It is apparently a permanent structure although the defendant might change its location if it should see fit." *City of Centralia v. Wright,* 156 Ill. 561.

■■ Annexations, when made by the owner, must be presumed to be made with the design of their permanent enjoyment with the realty and accessory to it. *Calumet Iron and Steel Co. v. Lathrop,* 36 Ill.App. 249, 256.

A building has been defined as a fabric, *structure,* or edifice, such as a house, church, shop, or the like, designed for the habitation of men or animals or *for the shelter of property. People v. Blair,* 52 Ill.2d 371, 374.

Many authorities take the position that any and all machinery essen-

tial to the proper functioning of a plant, mill, or similar manufacturing is a fixture, or is at least so presumed to be, irrespective of the manner in which it is annexed to the realty and even though it is not attached thereto at all. This view is sometimes referred to as the "integrated industrial plant" doctrine and represents the modern trend of decisions. 35 Am. Jur. 2d *Fixtures,* secs. 10, 102; *Joyner v. Mitchell,* 267 Ill.App. 427; *Re Theodore A. Kochs Co.* (7th Cir.), 120 F.2d 603, 136 A.L.R. 1280; 19 I.L.P. *Fixtures,* sec. 4; *Guardian Life Insurance Co. v. Swanson,* 286 Ill.App. 278, 287.

84 C.J.S. *Taxation,* sec. 73, states, "Machinery used in a mining or manufacturing or other business establishment constituting a part of the plant and indispensable to its operation as such is commonly taxed with, and as a part of, the realty, and is not subject to taxation as personal property," and "It has been declared that in matters relating to taxation, rules more nearly conforming to those used in determining what constitutes fixtures as between grantor and grantee, vendor and vendee, or mortgagor and mortgagee should apply rather than the rule used in what constitutes removable fixtures as between landlord and tenant."

■■ Where property is adapted to the use to which the realty is devoted the use thereof in such manner furnishes such strong evidence of intent to make it a part of the freehold as not to be overcome by bookkeeping practices. *Guardian Life Insurance Co. v. Swanson, supra.*

■■ With the foregoing principles in mind we find that the items in dispute were annexed to the real estate in such manner as to become a part of it and that it was legally intended that they should be a part of the real estate. Accordingly, the judgment of the circuit court is reversed.

Reversed.

ALLOY and STOUDER, JJ., concur.