NATIONAL BOULEVARD BANK OF CHICAGO, Trustee, *et al.*, Plaintiffs-Appellants, *v.* CITIZENS UTILITIES CO. OF ILLINOIS, Defendant-Appellee.

First District (4th Division)    No. 81-1607

Opinion filed June 3, 1982.—Rehearing denied August 5, 1982.

Edward G. Finnegan, Ltd., of Chicago, for appellants.

Daniel J. Kucera and Christine Hehmeyer Rosso, both of Chapman and Cutler, of Chicago, for appellee.

JUSTICE ROMITI delivered the opinion of the court:
Plaintiffs initially objected to being charged sewage rates by the

defendant and went before the Illinois Commerce Commission. That body determined that its decision depended on the ownership of certain sewer mains; an issue it had no jurisdiction to decide. Accordingly, this declaratory judgment action was filed in the Chancery Division because plaintiffs also sought equitable relief. The trial court held that the conduct of the parties and certain documents acknowledging defendant's ownership of mains used by it established defendant's ownership of the mains in question. We hold that the trial court erred in holding (1) that the mains embedded in plaintiffs' property were personal property; (2) that plaintiffs' predecessor's conduct gave rise to an estoppel and (3) that the evidence shows ownership in defendant. Accordingly, we reverse and enter judgment for plaintiffs.

The pleadings, documentary evidence and testimony disclose that the property in question, Gladstone Glen Apartments, is a multiple-unit complex consisting of 466 units. While now part of the village of Prospect Heights, the area originally was part of unincorporated Cook County. It lies on the east side of Wolf Road and the north side of Willow Road. It runs approximately 1975 feet along Wolf and 625.7 feet along Willow. In 1965 the property line along Wolf Road extended to the center of that road. In 1963 the Metropolitan Sanitary District of Greater Chicago (MSD) was given an easement for its interceptor sewer within the property line east of the center of Wolf Road. The easement agreement provided that the grantor and its successors and assigns should have the right, at any time after the completion of that portion of the intercepting sewer located on the property, to connect its own sewers with the intercepting sewer.

In 1965 the developer-owner, Oakview Builders, started to build on the property. The project was constructed in three phases, the first 144 units being completed and occupied in 1965 and 1966; the remaining 322 apartments were completed at a later date. Collecting sewers connecting the various buildings were built by Oakview's contractor on Oakview's property. They ran, by gravitational pull, into a 23-foot-long, 12-inch-wide sewer main which connected directly into the MSD interceptor sewer. The 23-foot connecting sewer main ran from the edge of Wolf Road to the MSD interceptor sewer. In 1965 this was all on Oakview's property. MSD granted the connection permit on July 8, 1965. The permit provided that it was not transferable without the written permission of the MSD. It was stipulated by the parties that the only sewer mains used in collecting Gladstone Glen's sewage are the 2,600 feet of collecting sewers located within plaintiffs' present property line and the 23-foot sewer connection, all of which were built and paid for by Oakview, and the MSD interceptor sewer. Unless either the 2,600 feet of collecting sewers or the 23-foot sewer connection built at Oakview's direction belong to defend-

ant, no part of the system used is defendant's. In other words, no connections were made into any part of defendant's already existing sewerage system. No sewer main belonging to defendant was ever extended to Gladstone Glen.

Defendant, Citizens Utilities Company of Illinois, is a public utility engaged in furnishing water and sewer service in certain areas of Cook, Du Page and Will Counties, Illinois. On January 25, 1965, Oakview Builders sent a formal request to defendant for water and sanitary sewer service for parcels 1 and 3 of the property. On July 30, 1965, the Illinois Commerce Commission entered an order and certificate of convenience and necessity allowing defendant to render such service finding that there was no other service available in the area to meet the need. As already noted, three weeks before MSD had granted Oakview permission to hook up to its interceptor main.

Besides the 23-foot sewer main which was built in 1965 and the other sewer mains, Oakview also extended defendant's water main 2,085 feet to its own property. Beginning on January 1, 1966, Oakview filed applications for service for the nine buildings of the first development, a total of 144 units, as each was completed and ready for occupancy. The applications, on forms prepared by defendant, read as follows:

"NO. MOV—1600

SERVICE APPLICATION AND AGREEMENT

The undersigned applicant requests that CITIZENS UTILITIES COMPANY OF ILLINOIS hereinafter referred to as the 'Company' provide water and sanitary sewer service requirements at the premises described below, and agrees to accept and pay for service in accordance with the Company's rates, rules, regulations and conditions of service from time to time on file with the Illinois Commerce Commission.

\* \* \*

The applicant agrees to install, if not already installed, and to maintain at his own expense in good condition all service lines in the premises described below and that the Company owns and shall maintain at the Company's expense all mains and other facilities used in rendering service to the applicant, including any meter located in the premises described below. The Company shall have free access to said meter at all reasonable times. If the meter is not read during any billing period, the Company shall render and the applicant agrees to pay an estimated bill for said billing period."

No applications for service to the rest of the buildings, if there were any, were introduced into evidence.

On July 15, 1966, an interoffice memo was sent by I. Jacobson stating

they had to have improvement orders, easements, as-built engineering drawings, lien waivers and invoices showing the costs of all of the construction involved on the property, including the connecting mains. The easement was to confirm that the facilities within the subdivision were defendant's. Exhibit A attached to the easement was to cover the entire tract. Both the easement and Exhibit A were to be recorded. In fact they were not.

The easement was not signed until December 8, 1966, over one year after the sewer connection was finished and the sewer put in operation. Relevant portions of the "Grant of Perpetual Right and Easement" read as follows:

"In consideration of Ten Dollars ($10.00) and other good and valuable consideration, receipt of which is hereby acknowledged, WOLF PALATINE GARDENS, AS AGENT FOR EXCHANGE NATIONAL BANK, TRUST U/T No. 18621, a partnership (hereinafter called 'Grantor') duly authorized to transact business in the State of Illinois, being the owner of that certain tract of real estate to be subdivided and known as of this date as Lamplighter Apartments, shown on and legally described on Exhibit A attached hereto and made a part hereof, hereby grants to Citizens Utilities Company of Illinois, an Illinois corporation (hereinafter called 'Utility'), its successors and assigns, a perpetual right and easement in, upon, along and under the parcels of real estate designated or to be designated, within the tract of real estate shown by said Exhibit A, as 'streets', 'roads', 'boulevards', 'lanes', 'drives', and other public places, and also in, upon, along and under those parcels of real estate designated or to be designated therein as utility or drainage easements, to install, construct, operate, maintain, repair and renew water mains, pipes, gates, valves, hydrants, sewage collection lines, manholes, lampholes, effluent lines and all other appurtenances or facilities which may be used by Utility in furnishing water service and sewage collection, treatment and disposal service in the tract of real estate shown on and described by said Exhibit A, or in any adjacent or other territory, including, without being limited to, the right to enter upon said parcels of real estate designated or to be designated as aforesaid, to make openings therein, to excavate beneath the surface thereof for the purpose of installing, constructing, operating, maintaining, repairing or renewing any facilities of Utility, and to carry on its business as a public utility by means of the facilities located in, upon, along or under such streets, roads, boulevards, lanes, drives, public places, utility and drainage easements; provided, however, that any excavation or other work by Utility shall be completed in a reasonable time, and after completion Utility shall restore the surface of

the area opened to substantially as good condition as it was in before such opening.

        * * *

Grantor, for itself and for its successors or assigns to any or all parcels of real estate within the tract of real estate shown by said Exhibit A, hereby acknowledges that ownership of, control of, and title to all water mains, pipes, gates, valves, hydrants, sewage collection lines, manholes, lampholes, effluent lines and all other appurtenances or facilities which may be used by Utility in furnishing water service and sewage collection, treatment and disposal service in the tract of real estate shown on and described by said Exhibit A is vested solely in Utility, free and clear of all encumbrances or claims including claims for payment by Grantor, its successors or assigns or parties claiming under Grantor, its successors or assigns."

Exhibit A attached to and referred to in the easement contains no legal description. It shows the west boundary line, Wolf Road, and the easement along it. While Willow Road is shown on the drawing, the length of the property along Willow is not shown. The northern boundary of the property is not shown at all and the eastern boundary is not designated. The drawing merely shows a 15-foot easement along Wolf and a 100-foot temporary easement. These appear to be identical easements given in 1963 to the MSD.

Also on December 8, 1966, a lien waiver was given by Oakview as contractor to defendant for and in consideration of $48,607.86. Certain other lien waivers naming Oakview Builders, Inc., as employer and signed by Oakview and others working on the site were also signed early in 1967 and turned over to defendant as a condition to Oakview's receiving a refund. Likewise invoices for building water and sewer mains for phase I of the project were turned over to defendant. They were paid, however, by Oakview, not defendant. An improvement order covering the project was prepared on December 9, 1966, over one year after the sewer facilities were constructed and placed in service. And on February 24, 1967, a journal entry for the month of December 1966 was prepared, transferring the cost of water and sewer mains, in the amount of $60,945, from "Construction Work in Progress" to various accounts, primarily "Customers Advances for Construction." In fact the total cost of all of the water and sewer mains now claimed by defendant was over $120,000. "Construction Work in Progress" accounts are to include the total of the balance of work orders in the process of construction but not ready for service on the date of the balance sheet. It appears the balance sheet was dated 1966, after the sewer mains were put in operation.

As already noted, the applications for service requested both sewer

and water service. It is undisputed that both were paid for until 1975 when plaintiffs purchased the property.

On March 26, 1968, defendant sought permission from the Illinois Commerce Commission to require every customer taking water from defendant to take and pay for sewer service also. The Commission found that it had been the company's policy to provide both water and sanitary sewer service to all customers where it was authorized to do so and both services were available, and had projected its expenses and established its staff on the basis it would provide both services. The Commission, however, held that the proposal was contrary to public policy.

In 1970 Oakview was finally paid $21,331.60 by defendant. The receipt prepared by defendant and signed by Oakview stated it was "payment in full for refunds due on main extension agreement providing for the extension of water and sewer mains to the property." However as already noted in fact only defendant's water main was extended to the property; no sewer main of defendant was extended to the property.

Early in 1975 plaintiffs acquired title to Gladstone Glen. The title policy issued in connection with the purchase does not indicate either the holding of an easement by defendant or its ownership of any of the sewer mains. (Apparently by this time no part of Wolf Road was part of the property, Wolf being now a dedicated expressway.) Defendant asked plaintiffs to sign an agreement for services for the sewers. Plaintiffs refused. When payment for sewage service was withheld, defendant terminated the water service. In order to obtain water service, the bills for sewerage service were then paid under protest. In October 1975, plaintiffs filed a complaint with the Illinois Commerce Commission challenging defendant's right to assess sewage charges against plaintiffs' property. At the hearing before the Commission, Walter S. Larson testified. He was defendant's general manager and had been with the company for the previous 14 years. He testified that defendant only owned sewer mains in the easements or right-of-way and not on the on-site portion of the property; that they had easements and/or rights-of-way along Wolf Road. In answer to questioning by the hearing examiner he testified specifically that its sewer mains ran only and exclusively on Wolf Road. The Commission stated in its order that the parties agreed that any and all water and sewer facilities contained within plaintiffs' complex area were owned by plaintiffs and the contention was who owned the 12-inch main. The Commission found that defendant's claim before it was based in part on an alleged oral main extension agreement with the only documentary evidence pertaining thereto being the receipt of January 1970. The Commission further found that defendant's tariffs on file with the Commission on or before the date of the receipt did not contain any main extension

agreement. The Commission also referred to the evidence of a lack of any maintenance or inspection of the main by defendant. The Commission held that the issues before it were dependent on a determination of ownership and the adjudication of rights under the "Grant of Perpetual Right and Easement" which was beyond the jurisdiction of the Commission. Plaintiffs thereupon filed this action in chancery seeking a declaration as to ownership and other equitable relief.

At trial Vincent Bolger, one of the beneficial owners of the property, testified as to the nature of the apartment complex and the events occurring in 1975, which have already been set forth. He testified that about three months after the complex was purchased, it was necessary for them to spend $943.34 to buy a sewer rodder to maintain the sewers. He had no knowledge whether Gladstone Glen had ever rodded the sewers. He also did not know if Gladstone Glen had ever requested defendant to rod the sewers.

Irving Lefkovitz was one of the partners of Oakview Builders. He testified that they acquired the property in 1964. At that time it was county farm land. They went to the county for building permits and to MSD for sewer permits. The Building Department of Cook County would not allow them building permits until they had a source of water for service to the property. Accordingly in January 1965 they applied to defendant for water service. While Lefkovitz testified that they knew at that time sewer service was going to be provided by a MSD tie-in, he acknowledged that the letter of January 25, 1965, requested both water and sewer service.

They received the permit from MSD in July and the actual connection was made three or four months later. Sewage was flowing through the mains by January 1, 1966. Occupancy of the first phase of the apartment complex probably began either late in 1965 or early in 1966.

When they approached defendant for water service, defendant's water mains terminated at Willow and Lee over 2,000 feet away. They constructed a 2,100-foot main to connect defendant's water main to the property. It cost between $20,000 and $25,000 for this extension and they had an agreement that they would be repaid that cost. They had no agreement with respect to extending defendant's sanitary sewer lines or mains, and there was no extension of existing sanitary sewers belonging to defendant to the property.

Lefkovitz testified that they never needed sanitary sewer service from defendant. When they made applications beginning on January 1, 1966, for water and sewer service, the sewer was already connected and sewage was flowing through the mains. They had no need at that point for sanitary sewer service from defendant but they did need water service.

The application forms were drawn up by defendant. Likewise Lefkovitz testified that on December 8, 1966, the date of the "Grant of Perpetual Right and Easement," they had no need of sanitary sewer service from defendant; the MSD interceptor sewer was being utilized.

Plaintiffs' last witness was James Muldowney, a professional engineer. He testified that the Exhibit A attached to the "Grant of Perpetual Right and Easement" appeared to be the same attached to the grant of easement to the Metropolitan Sanitary District. He also testified that defendant had not filed any inspection reports on the sewers in question although such are required by law.

Defendant's only witness at trial was Charles Weiss, an assistant vice president and assistant secretary of defendant. Weiss did not become an employee until 1968 so he had no personal knowledge of any transactions in 1965 and 1966. Extensive testimony over plaintiffs' objection as to what the parties did in those years being based not on his personal knowledge but on conclusions drawn from documents in evidence was not competent or probative.

Weiss also testified that he participated in the calculation of the 1970 refund in the amount of $21,331.60. The amount of the refund was computed by taking 2½ times the first year's revenues from the customer for water and sewer service. These revenues came from the 144 units originally built, not from the units built later. He testified that the forms for application for water and sewer service were company forms. He stated that the company has a separate form for water service only; however, he did not testify as to whether the company in 1966 had a separate form for requesting water service only.

Weiss also testified that defendant had recently entered into an agreement with MSD to perform physical and other tests of its system and perform any recommended rehabilitation work. The system in question would be part of the agreement.

On cross-examination, Weiss admitted that defendant was not a permittee to the connection with MSD. He stated that even though MSD had given Oakview permission to hook on, there was in 1965 still not an adequate source of sewer service to meet the needs of the property because MSD generally does not provide direct service, but he admitted that the correct practice is to name defendant as a co-permittee. When asked if there were any records showing entry on the premises for purposes of repairs, he said he had seen one record which indicated an examination of sewer facilities in 1976, after proceedings were filed before the Commission. He could name no other occurrence. He also admitted that to his knowledge defendant had not made any reports to MSD with respect to the maintenance of the sewer. He also admitted that no easements in favor of the company were recorded with the Cook County recorder of deeds.

## I

The trial court's finding for the defendant appears, from its opinion, to be based on three premises:

A. the sewer mains are personal property;

B. defendant's predecessor would be estopped to challenge defendant's title to sewer lines which it had heretofore by both overt action and passive acquiescence allowed Citizens to rely on for a lengthy period of time and plaintiffs as grantees of title take subject to whatever limitations bound their grantor;

C. while there is no document entitled "Bill of Sale" the sum of the evidence equates to such a definitive transfer.

We cannot agree on any of the premises.

■■ The trial court in holding that the sewer mains are personal property relied on the Revenue Act of 1939 (Ill. Rev. Stat. 1979, ch. 120, par. 544), and *Shelbyville Water Co. v. People ex rel. Craddick* (1892), 140 Ill. 545, 30 N.E. 676. We do not believe either to be applicable. The Revenue Act merely provides that for the limited purpose of the assessment of personal property taxes, a utility's mains are to be regarded as personal property. Clearly such statute does not otherwise affect their status. Likewise, the court in *Shelbyville*, persuaded by the current revenue statute, held that for purposes of taxation a utility's mains and wires which were directly connected to the utility's engines and boilers were personal property for the purpose of taxation since the engines and boilers which otherwise were part of the realty were, under the Revenue Act of 1939, personal property. (*Johnson v. Roberts* (1882), 102 Ill. 655.) The question here is not whether the mains can be assessed for personal property taxes; furthermore they are not directly connected with the defendant's engines and boilers.

Fixtures are by definition real property because they are incorporated in or attached to the realty. (*White Way Electric Sign & Maintenance Co. v. Chicago Title & Trust Co.* (1938), 368 Ill. 482, 14 N.E.2d 839.) Chattels become real estate when annexed to the freehold under such circumstances that it appears clearly from an inspection of the property itself, taking into consideration the character of the annexation, the nature and adaptation of the articles annexed to the uses and purposes of the freehold at the time of the annexation, and the relation of the annexing person to the freehold in question, that a permanent annexation to the freehold was intended. (*Galena Iron Works Co. v. McDonald* (1911), 160 Ill. App. 211; 19 Ill. L. & Prac. *Fixtures* §2 (1956).) That water and sewer mains are normally considered real property is shown by the fact they are subject to the imposition of mechanics' liens (*Berry v. Blackard Construction Co.* (1973), 13 Ill. App. 3d 768, 300 N.E.2d 627), although such may be imposed only on realty. *Dual Temp Installations, Inc. v. Chicago Title & Trust Co.* (1976), 41 Ill. App. 3d 415, 354 N.E.2d 131, *appeal*

*denied* (1976), 64 Ill. 2d 595; *Miller v. Reed* (1973), 13 Ill. App. 3d 1074, 302 N.E.2d 131; *Wanzer v. Smorgas-Brickan Developers, Inc.* (1970), 130 Ill. App. 2d 378, 264 N.E.2d 435; Ill. Rev. Stat. 1979, ch. 82, par. 1.

■■ All of the sewer mains here are clearly annexed to, indeed buried in, the plaintiffs' property and were installed for the use of the freehold. Under such circumstances, there is a presumption that they are real property and the burden is on the person claiming they are personal property to show that they were not intended to be permanently annexed to the freehold but only to be personal property. *Merchants Loan & Trust Co. v. Merchants Safe Deposit Co.* (1912), 167 Ill. App. 315.

■■ There is no evidence that the developer did not intend the mains to be a part of the property; to the contrary, the mains were constructed for the permanent use of the residents of the development. When annexations are made by the owner they are presumed to be made with the design of their permanent enjoyment with the realty. (*Ayrshire Coal Co. v. Property Tax Appeal Board* (1974), 19 Ill. App. 3d 41, 310 N.E.2d 667.) Furthermore, the evidence discloses that defendant recognized the mains to be real property since the memo of July 15, 1966, instructed that lien waivers were to be obtained and that the easement which "confirms that the facilities within the subdivision are ours" was to be recorded. The evidence in the record, however, indicates that despite the instructions it was not recorded and defendant at no time has contended that it was.

■■ Whether the mains are real or personal property is relevant since in general title to real estate cannot be transferred by parol but can only be transferred by a writing (*Skinner v. Francisco* (1949), 404 Ill. 356, 88 N.E.2d 867; *Weegens v. Karels* (1940), 374 Ill. 273, 29 N.E.2d 248), sufficiently describing the property. (*Chicago & Alton R.R. Co. v. Langer* (1919), 288 Ill. 16, 123 N.E. 61.) The service application and agreements obviously are insufficient since the sole words of description "all mains and other facilities used in rendering service" do not adequately and unambiguously describe the property. It is unclear what mains are referred to, those used to service the 144 units or others as well nor is it clear what are service lines belonging to applicant as opposed to mains. The "Grant of Perpetual Right of Easement" likewise suffers from ambiguity since it refers to all sewerage collection lines and effluent lines which may be used by the utility and does not define which ones are used by the utility. Furthermore it contains no legal description of the premises, and exhibit A referred to in the easement and attached to it merely shows the Wolf Road property line. Finally it was not recorded although a transfer of real property is ineffective against a purchaser without notice absent recording. (Ill. Rev. Stat. 1973, ch. 30, par. 29; *Thorpe v. Helmer* (1916), 275 Ill. 86, 113 N.E. 954; *Kovacevic v. City of Chicago* (1977), 47 Ill. App.

3d 674, 365 N.E.2d 104; *Kahn v. Deerpark Investment Co.* (1969), 115 Ill. App. 2d 121, 253 N.E.2d 121.) No notice has been shown in this case.

## II

■■ But even if we were to hold that the mains were personal property, or that because the suit was in chancery, no proof of a written conveyance was required (see *Ross v. Ross* (1950), 406 Ill. 598, 94 N.E.2d 885 (*dictum*)), we still find that there is no evidence ownership in the mains is in the defendant. The trial court held that the plaintiffs' predecessor in title was estopped to challenge defendant's title and plaintiffs as purchasers had no greater rights. Before an estoppel can be found, there must be reliance resulting in prejudice to the party claiming estoppel. (*Ladd Construction Co. v. Insurance Co. of North America* (1979), 73 Ill. App. 3d 43, 391 N.E.2d 568; *Gasbarra v. St. James Hospital* (1980), 85 Ill. App. 3d 32, 406 N.E.2d 544, *appeal denied* (1980), 81 Ill. 2d 590; *Old Mutual Casualty Co. v. Clark* (1977), 53 Ill. App. 3d 274, 368 N.E.2d 702.) There is no evidence that defendant has suffered any injury here. It has not incurred any expense in relation to the lines or changed its position believing that it was owner thereof. To the contrary, while performing no service on the line it has benefitted by collecting revenues monthly for sewer service.

## III

Defendant, relying on Weiss' testimony, argues in its brief that defendant had Oakview Builders build the sewer mains as its contractor. As already noted, Weiss only joined defendant in 1968 and since he had no personal knowledge of what occurred in 1965 and 1966 could not properly testify as to what occurred in those years.

We are aware that Oakview Builders in 1966 did sign one lien waiver. Despite this lien waiver, the overwhelming evidence discloses that defendant was not the initial owner and indeed had little actual knowledge of the construction. Since defendant did not own the mains in question and did not even have an easement in question until 1966, to the extent it ever acquired an easement, it could not, in 1965, have hired a contractor to build mains on someone else's property. Oakview, not defendant, paid for both work and supplies. Defendant did not pay for any part of the work at the time and in 1970 paid only a fraction of the total cost.

The defendant's records disclose that, far from ordering Oakview as contractor to construct the mains, it did not know how much had been done or how much the work had actually cost. It recorded $60,945 as construction costs on its books of account and on its improvement order. The waiver of lien from Oakview dated December 8, 1966, showed a total cost of $48,670.86. But the total cost of construction of all the mains defendant now claims it always owned was $125,000.

■■ It is also clear that the defendant's records were not made during the normal course of construction. Construction of the sewer main was completed before the end of 1965, but the defendant's so-called improvement order is dated one year later despite Weiss' testimony that the company issued the order when the contractor was retained. Under the circumstances neither the improvement order, made not during the regular course of construction but at some later time, nor the books of account also made after construction was completed have probative value in this case as to the intent and understanding of the parties. Indeed it is doubtful whether they even came within the scope of Supreme Court Rule 236 (73 Ill. 2d R. 236), which allows the consideration of business records as evidence, since they were not made at the time of the event or within a reasonable time thereafter.

Furthermore, the trial court by implication found that defendant was not the original owner of the mains since it held that "the sum of the evidence equates to such a definitive transfer."

■■ The trial court found such transfer based on documentation, conduct, and long-standing acquiescence. As this court has already held, Oakview's conduct and long-standing acquiescence were insufficient to give rise to an estoppel since there was no prejudice to the defendant. We further hold that the documentation in evidence is insufficient to transfer either the on-site mains or the 23-foot sewer main to the defendant. The on-site sewer mains are not even referred to in the "Grant of Perpetual Right and Easement." That document granted an easement only to the "parcels of real estate designated or to be designated, within, along or under the parcels of real estate shown by said Exhibit A," as "streets," "roads," and similar terms plus the area designated as a utility or drainage easement, that is the easement along Wolf Road. The property allegedly transferred in paragraph 3 is only that in the real estate shown on and described by Exhibit A. The only description on Exhibit A is the length of the property along Wolf Road. The depth of the property is not described. Indeed any other construction of the document would mean that defendant owned mains it could not maintain since it has no easement on the property through which they run. The applications for service also do not support defendant's contention that a transfer of the on-site mains was made. Those applications state "the applicant agrees to install and maintain at its own expense all service lines in the premises * * * and the company owns and shall maintain at the company's expense all mains * * *." Obviously the applicant owns the service lines. But it is not clear from the service applications whether the on-site mains are "service lines on the premises" or "mains." Absent clarification, this ambiguity would have to be construed against defendant as drafter of the document. (*Ricke v. Ricke* (1980), 83 Ill. App. 3d 1115, 405 N.E.2d 351; *Crest Builders, Inc. v.*

*Willow Falls Improvement Association* (1979), 74 Ill. App. 3d 420, 393 N.E.2d 107; *Quest v. Robertson* (1979), 71 Ill. App. 3d 678, 388 N.E.2d 1335, *appeal denied* (1979), 79 Ill. 2d 617.) It is however clarified by Larson's testimony before the Illinois Commerce Commission that the defendant's sewer mains run only and exclusively on Wolf Road; they did not claim any on-site mains.

The documents were also insufficient to transfer the 23-foot sewer main, even if it should be considered personal rather than real property. The easement only transferred sewer collection lines and effluent lines which may be used by the utility in sewerage collection treatment and disposal service. Likewise the service applications only acknowledge that the company owned and should maintain mains used in rendering service. There was, however, no evidence that the company had rendered any sewerage service and thus had used the mains for that purpose. To the contrary it was admitted that the company had not performed any maintenance work on the mains. Defendant has not filed the inspection reports required by law. The mains are not hooked up to any lines of defendant; they are hooked into the MSD's line. The permit to build and attach the main was issued to Oakview Builders, not to defendant, and was not transferable without written permission of the MSD. Lefkovitz testified that they never needed sanitary sewer service from defendant and it is apparent from the record that while defendant collected sewer charges for 10 years, it in fact rendered no service. Rendering no service, it did not use the mains and thus under the limitation in the alleged transfer agreements, the sewer mains do not belong to defendant.

We are aware that in 1970 the refund was based on revenues from both the water and sewer mains, and the receipt drawn up by defendant and signed by Oakview reflected that. But the undisputed testimony of Lefkovitz was that the agreement was that they would be repaid the cost of extending the water main and there was no agreement as to extending sewer lines. Defendant's conduct in 1970, while it may be relevant, cannot alter the effect of an agreement made in 1966.

Before the Illinois Commerce Commission defendant contended that there was an oral conveyance of the main. However, the trial court, as already noted, made its finding of transfer based on documentation, conduct and long-standing acquiescence. It did not find any oral conveyance and there was no competent evidence of any oral conveyance.

■■ Defendant contends on appeal that we are bound by the trial court's findings and may not disturb them unless they are manifestly without support. But that rule is not applicable in this case where with minor exceptions the only competent and probative evidence is documentary. Where the evidence is documentary, the appellate court is not bound by the trial court's findings of fact but can examine the evidence and reach an

independent conclusion. (*Wolverine Insurance Co. v. Jockish* (1980), 83 Ill. App. 3d 411, 403 N.E.2d 1290; *Carlson v. Carlson* (1979), 74 Ill. App. 3d 673, 393 N.E.2d 643; *Barraia v. Donoghue* (1977), 49 Ill. App. 3d 280, 364 N.E.2d 952.) In any event the appellate court may always reverse where, as here, the judgment or findings of the trial court are unsupported by the evidence. *Jack Frost Sales, Inc. v. Harris Trust & Savings Bank* (1982), 104 Ill. App. 3d 933, 433 N.E.2d 951.

Since whether the sewer mains are considered real or personal property it is clear from the evidence that they were originally owned by Oakview and there is no evidence in the record to show they were transferred to defendant, the judgment of the trial court is reversed and judgment entered for plaintiffs.

Reversed; judgment entered for plaintiffs.

JOHNSON, P. J., and LINN, J., concur.